UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| Lori Thompson | : | DOCKET NO. |
|  | : |  |
| v. | : |  |
|  | : |  |
| INGKA GROUP, LLC | : |  |
| doing business as IKEA | : |  |
|  | : |  |

## COMPLAINT FOR CIVIL ACTION

### PRELIMINARY STATEMENT

1.      Plaintiff Lori Thompson had been was Commercial Manager of Defendant's College Park, Maryland store for more than twelve years.  She had performed her job well and even saved the store a significant sum of money through additional initiative and investigation. In or about 2016 and 2017 Defendant rolled out a reorganization program called "Organizing for Growth" which required senior management to reapply for its positions and was a thinly veiled attempt at company-wide weeding of managers who were more than 40 years old.

In 2018 and 2019, while this reorganization was ongoing, Plaintiff continued to build back store revenue and preserve costs, but her supervisor left Defendant at the end of August of 2019.  His replacement, in accordance with "Organizing for Growth" attempted to falsify Plaintiff's annual review and terminated her employment on December 3, 2019, but only after she had given him more than three months' notice that in February of 2020 she would be taking leave pursuant to FMLA.

### PARTIES

2.      Plaintiff is Lori Thompson, a 53-year-old woman who up through and including December of 2019 was employed by IKEA in the position of "Commercial Manager" at IKEA's store located in College Park, Maryland and resides at 115 West Branch Street, Berlin, Maryland.

- 1 -

3.      "IKEA" is a multinational company that presents and promotes itself publicly as a centrally controlled entity known as the "INGKA Group, LLC."

4.      The INGKA Group, LLC operates in the United States through various owned and controlled subsidiary entities all of which do business as and present themselves as "IKEA," including, for example and without limitation, defendants IKEA Holding US, Inc., IKEA US Retail, LLC, and IKEA North America Services, LLC.

5.      For purposes of this charge, all of the subsidiaries, affiliates, and entities through which INGKA Group, LLC operates in the United States and the State of Maryland are hereinafter referred to as IKEA.

6.      IKEA's headquarters in the United States is situate in Conshohocken, Pennsylvania.

7.      Defendants share common ownership, management, human resources, and employment policies.

8.      The employees of IKEA, regardless of the particular entity or payroll company from which their form W-2 is issued, are subject to the same, centrally controlled policies regarding human resources and employment matters.

9.      IKEA is interconnected such that the entities that comprise it are considered a "single" and/or "integrated" employer, and/or "joint" employer.

10.     At all times material to this Statement of Claim, IKEA employed over 15,000 people in the United States.

11.     At all times material hereto, IKEA has been engaged in an industry affecting interstate commerce and have acted as an "employer" within the meaning of the ADEA and the FMLA.

<u>JURISDICTION AND VENUE</u>

12.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C.

§1331, 1343 and 1367 and 42 U.S.C. §2000(d)-5(f)(3).

13.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. 2000e-

5(f)(3) in that the United States headquarters for Defendant are situate in Conshohocken,

Pennsylvania, and all decisions made at Plaintiff's level of employment are confirmed and

approved locally.

14.     On May 28, 2020 Plaintiff filed a charge of discrimination with the Maryland

Commission on Civil Rights via facsimile and email as well as first class mail because that

Commission was not open due to the COVID-19 pandemic.  A copy of the cover letter for that

filing is attached hereto, made part hereof, and marked Exhibit "A".

15.     Thereafter a follow-up intake conversation was held with Phillip Wikes, a Civil

Rights Officer with the Maryland Commission on Civil Rights who prepared an Amended and

Restated Statement of Claim, a copy of which is attached hereto, made part hereof, and marked

Exhibit "B."

16.     This Charge was dual filed with the Equal Employment Opportunity Commission.

17.     Despite having the file for over eighteen months, no action was taken on

Plaintiff's charge until November of 2021 at which point an investigator conducted a phone

interview.

18.     More than 18 months have elapsed since the cross filing of Plaintiff's charge of

discrimination with the state and Federal commissions, and Plaintiff has clearly exhausted all

administrative remedies available to her.

FACTS

19.     As Commercial Manager, Plaintiff was responsible for all commercial aspects of the store, including prep and flow, sales plan, steer merchandising basics, communication, and interior design, as well as product quality.

20.     Plaintiff had worked at IKEA for more than twelve (12) years and had also held the positions of Logistics Manager (from 2007 to 2016) and Business Navigation/Operations Manager (from 2016 through 2017).

21.     Shortly before the end of the 2019 fiscal year, in or about the end of August of 2019, Plaintiff personally and single-handedly negotiated a settlement between IKEA College Park and a third-party vendor XPO LOGISTICS ("XPO").

22.     The settlement was in the favor of IKEA and Plaintiff was able to secure $118,000.00 payback from XPO to IKEA College Park for overbilling of assembly fees that took place over an extended period.

23.     Following this settlement, Plaintiff's store manager, Frank Briel ("Briel") thanked Plaintiff personally for her work and due diligence multiple times and he lauded her and her results in front of the entire management team on at least three other occasions.

24.     Briel's last official day with IKEA College Park was August 31, 2019.

25.     Briel was replaced by Sanjay Kumar ("Kumar").

26.     Briel completed Plaintiff's performance evaluation in IKEA's personnel information system prior to his departure from IKEA.

27.     In September of 2019 Plaintiff had known for more than a year that she had a medical condition ("condition") which was going to require surgical intervention, the recovery from which was going to result in her inability to perform the essential functions of her job during her recovery.

- 4 -

28.     The medical condition did not at that time in any way render her disabled, however post-surgically, she would be temporarily unable to perform the essential functions of my job for a brief period.

29.     Plaintiff informed Kumar that it was her intention not to schedule the surgery until February or March of 2020 which were typically slower periods for the store.

30.     Plaintiff told Kumar at that time that she intended to take leave pursuant to the Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601 *et sequitur.*

31.     Shortly thereafter, on or about October 21, 2019 Kumar the new store manager delivered Plaintiff's Performance Evaluation in which he accused Plaintiff of being negligent in identifying the overbilling by XPO thereby costing IKEA lost profit, which is contrary to the foregoing facts.

32.     Plaintiff insisted that Kumar remove that notation from her review as:

        a.     The allegation was untrue;

        b.     The primary responsibility for researching and following up on billing questions was that of the Field Business Navigation Manager, not Plaintiff;

        c.     Plaintiff had negotiated a settlement to IKEA's advantage even though IKEA's legal team had elected not to pursue a claim.

        d.     The claim was completely inconsistent with Briel's prior praise for Plaintiff for having addressed the situation that was not even in her area of responsibility.

33.     Briel denied that he had anything to do with Kumar's negative comments, which were based upon something that happened *before* Kumar was Plaintiff's manager and with which Kumar had nothing to do.

34.     Briel also confirmed that his completed review of Plaintiff's performance did not contain such criticism as Kumar manufactured.

35.     Kumar then agreed to remove his comments from Plaintiff's annual review, and the result was an annual review where overall she met standards and was entitled to a pay increase.

36.     Based upon her performance evaluation Plaintiff was eligible for a pay increase in 2020 of 2.5% to 3.5%.

37.     In the fall of 2019 Plaintiff was 51 years old and was the oldest member of the store's senior management team.

38.     Plaintiff went to see my physician about the condition only once in November of 2019.

39.     Plaintiff went to see my physician about the condition only once in December of 2019.

40.     At the point in time when she saw her physician in December, Kumar himself had been out of the store since prior to Thanksgiving of 2019.

41.     On December 3, 2019, Kumar told Plaintiff that he was terminating her employment "at will", allegedly because there was "not enough movement in the commercial areas of the store."

42.     Plaintiff believes this excuse was pretextual, as at that point in time store sales were up year over year in every metric for which Plaintiff was responsible as Commercial Manager.

43.     Plaintiff believes the excuse was pretextual because Kumar had clearly wanted to "blame" Plaintiff for the problem which had been under the purview of another employee outside the store who did not report to her.

44.     Plaintiff believes this termination was discriminatory based upon her age (over 40) and upon her anticipating need for Family and Medical Leave as well as based upon IKEA regarding her as already disabled and/or attempting to avoiding having to accommodate her upon her recovery.

45.     Plaintiff believes Kumar's explanation was pretextual because IKEA had treated other management employees who were under the age of 40 differently than he treated her.

46.     Respondent IKEA is a multinational company that has a corporate culture of age discrimination and age bias.

47.     IKEA openly expresses a preference in favor of young employees as the future leaders of the company.

48.     IKEA, among other things, has set age-biased personnel goals for management level employees.

49.     IKEA, among other things, has considered age in its employment decisions.

50.     IKEA, among other things, has tended to prefer younger individuals in management positions.

51.     IKEA has communicated its preference for young people in management positions throughout the entirety of its company, affiliates, and subsidiaries.

52.     IKEA's age bias from the top-down infuses and infects the employment decision-making process throughout its entirety.

53.     IKEA's age bias from the top-down infuses and infects the decisions regarding the discipline imposed on employees and the decision to terminate employees throughout its entirety.

54.     Since February 12, 2018, at least five current or former IKEA employees have filed age discrimination lawsuits against Defendants in the United States District Courts, alleging, among other things, that IKEA operating in the US considers age in its employment decisions and acts upon its openly expressed preference in favor of younger employees to the detriment of its older employees. The captions of these lawsuits are as follows:

      a.     *Donofrio v. IKEA US Retail, LLC* (E.D. Pa. No. 2: 18-cv-00599)

      b.     *Parker v. IKEA North America Services, LLC* (E.D. Pa. 2:18-cv-03261);

    c.    *Gorbeck v. IKEA North America Services, LLC, et al.* (E.D. Pa. 2: 18-cv-00599);

    d.    *Nasci v. IKEA North America Services, LLC* (W.D. Pa. 2:18-cv-01643); and

    e.    *Paine IKEA North America Services, LLC* (E.D. Pa. 2:19-cv--00723).

55.    Other similar claims are pending against IKEA before the EEOC and other agencies.

56.    IKEA has engaged in systematic age discrimination against its Older Workers.

57.    IKEA has engaged in systematic discrimination against persons seeking to take Family and Medical Leave.

58.    IKEA has engaged in systematic discrimination against persons it regards Plaintiff as disabled, or apprehends that she will become disabled after surgical intervention.

59.    IKEA has engaged in a pattern and practice of age discrimination. Upon information and belief, and without limitation:

    a.    IKEA has had in place long term goals to have a younger management base and a certain number of younger individuals in management level positions. Every IKEA US store was directed that if it lost a member of its Store Steering Group, it was to fill the position with someone younger than 35. Specific goals of having a certain number of younger employees in management positions were stated in writing by the US Strategic Human Resources Committee and communicated to every store throughout the United States. The goals have been spoken of and communicated in different ways, such as in terms of "age distribution goals," "succession," "potential" or "diversity."

    b.    IKEA has tracked, monitored, and reported on its age-based personnel goals.

    c.    IKEA has had in place a long-term strategy for recruiting and promoting younger people into management positions.

d.      IKEA has had in place leadership development programs as part of a strategy to advance young employees into management positions.

e.      IKEA has had in place a policy of identifying the "potential" of its employees as a proxy to assess promotability in an age-biased manner.

f.      IKEA has undertaken recruiting efforts aimed at disciplining young individuals less frequently and less severely.

g.      IKEA has implemented multiple "reorganization" efforts, including one entitled "Organizing for Growth" (a/k/a "O4G"), to remove older employees from management positions.

h.      IKEA managers openly express age bias in favor of younger employees.

i.      IKEA fails to remediate complaints of age discrimination, and thus promotes a culture in which discrimination against older employees is tolerated and encouraged.

j.      IKEA has expressly stated to all employees - including decision makers, applicants, potential applicants, and those charged with complying with its stated anti-discrimination policies - that it is "looking for young talents."

k.      IKEA openly flouts the ADEA and state anti-discrimination laws by, without limitation, publicizing advertisements for expressing a preference for "young" candidates, such as for its "Global Young Potentials Program."

l.      IKEA is more likely to discipline employees because of their age.

m.      IKEA is more likely to discipline older employees more severely than those employees under the age of 40.

n.      IKEA is more likely to terminate employees because of their age.

60.     IKEA employment policies and/or practices are infected with age bias from the top down and infuse all aspects of its employment decisions.

61.     IKEA's employment policies and/or practices, such as, without limitation, disciplining older employees more severely than those employees under the age of 40, and/or its consideration of age in employment decisions, have resulted in a statistically significant disparity in the termination rates of its Older Workers.

62.     IKEA's policies infected with age bias, its corporate culture of age bias, its open expression of considering age in employment decisions and decisions about discipline and termination of employees, affecting the employment decisions made by IKEA and thereby adversely affecting IKEA's older employees.

63.     IKEA's polices are infected with age bias, its corporate culture of age bias, its open expression of considering age in employment decisions and decisions about discipline and termination of employees, and/or its openly expressed preference for developing and/or selecting younger employees as its future leaders, at the expense of older employees..

64.     IKEA has since well prior to December of 2019 engaged in a pattern and practice of age discrimination against its Older Workers, including Plaintiff.

65.     IKEA has by its actions since well prior to December of 2019, and prior thereto, intentionally discriminated against Older Workers, including Plaintiff.

66.     IKEA' s policies and/ or practices have since at least December of 2019, and prior thereto, resulted in a disparate impact against Older Workers, including Plaintiff.

67.     IKEA has since at least December of 2019, and prior thereto, terminated older employees, because of age.

68.     IKEA has since at least December of 2019, and prior thereto, imposed greater discipline on older employees than employees who were younger than 40 to trim its workplace of older employees.

## COUNT I
*Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601 et sequitur*

69.     Plaintiff incorporates all prior paragraphs as if set forth hereinafter.

70.     Defendant's decision to terminate the Plaintiff was motivated in substantial part by Plaintiff's request to take FMLA in February of 2020.

71.     At all times material to this complaint, Plaintiff was an eligible employee under the FMLA at 28 U.S.C. § 2611(2) and (11) in that she had worked for Defendant for at least a year, had worked for more than 1250 hours over that year, and required leave for a serious health condition.

72.     At all times material to this complaint, Defendant was an employer as defined under the FMLA at 28 U.S.C. § 5110(2).

73.     At all times material to this complaint, Plaintiff was entitled to take leave pursuant to the FMLA.

74.     Plaintiff gave formal notice to her direct superior, Kumar, of her intention to take qualified leave under FMLA.

75.     Kumar terminated Plaintiff's employment before she was able to take leave pursuant to the FMLA.

76.     Defendant interfered with Plaintiff's right to take leave under and pursuant to the FMLA.

77.     Plaintiff's notice to Kumar of her intention to take leave was "protected activity" under the FMLA.

78.     Kumar secured the termination of Plaintiff's employment because she intended to take such leave.

79.     Defendant retaliated against Plaintiff for giving notice of her intention to take FMLA-eligible leave.

80.     Defendant's interference and retaliation with Plaintiff's rights under the FMLA have caused Plaintiff to incur a loss of earnings, earning capacity, benefits, bonuses, equity grants, retirement benefits, and other financial losses.

## COUNT II
*Age Discrimination in Employment Act, 42 U.S.C. § 6101 et sequitur*

81.     Plaintiff incorporates all prior paragraphs as if set forth hereinafter.

82.     Defendant's intentionally discriminatory conduct against Plaintiff because of her age includes, but is not limited to:

          a.     Blaming Plaintiff for errors and omissions for which other of Defendant's employees were responsible;

          b.     Favoring younger employees when imposing discipline and/or criticism of Plaintiff's performance;

          c.     Possessing an entrenched, institutional bias against older senior managers;

          d.     Promulgating a reorganization expressly designed to promote and preserve only younger employees in senior management positions.

83.     Defendant intentionally discriminated against Plaintiff because of her age.

84.     Defendant engaged in a pattern and practice of age discrimination against Plaintiff in that:

          a.     Defendant superseded a valid employee evaluation of the Plaintiff by a supervisor familiar with Plaintiff's performance by an absentee supervisor unfamiliar with her work and possessed of institutional bias against older senior managers.

- 12 -

b.      Defendant had a corporate culture of preferring individuals under 40 to those over 40 and utilizing the meme of "reorganization" for routinely getting rid of older senior managers.

c.      Defendant's age-biased policies and practices such as "Organizing for Growth" were specifically designed to identify, reduce compensation for, and altogether eliminate those senior managers who were older than 40.

d.      Age was a "but for" factor in connection with Defendant's decision to terminate Plaintiff.

e.      Defendant routinely "eliminated the positions" of those senior managers over the age of 40.

85.     As a direct result of Defendant's discriminatory conduct, Plaintiff has in the past incurred and in the future will continue to incur a loss of earnings, earning capacity, benefits, bonuses, equity grants, retirement benefits, and other financial losses.

86.     By reason of the foregoing, Defendant has violated the ADEA.

87.     Defendant's violation of the ADEA has been willful and warrants the imposition of liquidated damages.

## **COUNT III**
*Anti-Discrimination Statute of the State of Maryland*

88.     Plaintiff incorporates all prior paragraphs as if set forth hereinafter.

89.     The Annotated Code of Maryland provides in pertinent part as follows:

It is the policy of the State, in the exercise of its police power for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers to assure all persons equal opportunity in receiving employment and in all labor management–union relations, regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; and to that end, to prohibit discrimination in employment by any person.

State Government Article, §20-602, Annotated Code of Maryland

90.     Upon information and belief, Plaintiff was terminated because of her age (over 40).

91.     Upon information and belief, other senior managers not over the age of 40 were treated differently than Plaintiff was.

92.     Upon information and belief, persons directly responsible for those  "issues" for which Kumar purportedly terminated Plaintiff were attributable to the conduct of persons not over the age of 40 who were not terminated.

93.     There are no legitimate business reasons for Plaintiff's termination.

94.     There was no bona fide occupational requirement which precluded Plaintiff continuing in her position as Commercial Manager.

95.     Defendant's violation of the Maryland Law Against Discrimination has been willful and warrants the imposition of punitive damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in her favor and against Defendant as follows:

A.     Damages in excess of ONE HUNDRED THOUSAND DOLLARS ($100,000);

B.     Actual damages;

C.     Consequential damages;

D.     Punitive damages;

E.     All damages available pursuant to the Age Discrimination in Employment Act, the Family and Medical Leave Act, and the Maryland Anti-Discrimination Law.

F.      Counsel fees and costs of this suit.

A JURY TRIAL IS DEMANDED BY PLAINTIFF.

_____

HAROLD M. GOLDNER
PA Attorney No. 32367
Kraut Harris, P.C.
5 Valley Square, Suite 120
Blue Bell, PA  19422
(215) 542-4900
Fax:  (215) 542-0199
hgoldner@krautharris.com

Exhibit "A"

# KRAUT HARRIS

*Counselors at Law*

HAROLD M. GOLDNER
*Of Counsel*
hgoldner@krautharris.com

5 Valley Square, Suite 120
Blue Bell, Pennsylvania 19422

Telephone  215-542-4900
Facsimile  215-542-0199

May 28, 2020

*(Via facsimile to 410-333-1841, email to mccr@maryland.gov
and first class mail)*

State of Maryland
Commission on Civil Rights
William Donald Schaefer Tower
6 Saint Paul Street, Suite 900
Baltimore, MD 21202-1631

RE:    Lori Thompson v. IKEA

Dear Sir or Madam:

Enclosed please find the Statement of Claim of Lori Thompson for filing with the Commission.  I am sending this via first class mail, postage prepaid, via email, as well as via facsimile, because I believe your offices are closed at this time due to the pandemic.

The Charging Party wishes to cross-file with the Equal Employment Opportunity Commission as well.

I am counsel of record for the Charging Party.

If you require further information, please do not hesitate to contact me.  While working remotely due to the pandemic, I can be reached at 215-696-6460.

I thank you for your attention to this matter.

Very truly yours,

HAROLD M. GOLDNER

HMG/hg

Enclosure

cc:    Lori Thompson (w/o encl.)

MARYLAND COMMISSION ON CIVIL RIGHTS

|                                                        |     |            |
| ------------------------------------------------------ | --- | ---------- |
|                                                        | :   |            |
| Lori Thompson                                          | :   | DOCKET NO. |
|                                                        | :   |            |
| v.                                                     | :   |            |
|                                                        | :   |            |
| IKEA North America Services, LLC                       | ;   |            |
| and                                                    | :   |            |
| IKEA U.S. Holdings, Inc., all                          | :   |            |
| doing business as IKEA                                 | :   |            |
|                                                        | :   |            |

## **<u>STATEMENT OF CLAIM</u>**

### <u>PARTIES</u>

1.      My name is Lori Thompson.  I am a 52-year-old woman who up through and including December of 2019 was employed by IKEA in the position of "Commercial Manager" at IKEA's store located in College Park, Maryland.  I reside at 115 West Branch Street, Berlin, Maryland.

2.      "IKEA" is a multinational company that presents and promotes itself publicly as a centrally controlled entity known as the "IKEA Group."

3.      The IKEA Group operates in the United States through various owned and controlled subsidiary entities all of which do business as and present themselves as "IKEA," including, without limitation, defendants IKEA Holding US, Inc., IKEA US Retail, LLC, and IKEA North America Services, LLC.

4.      Defendant IKEA Holding US, Inc. is a Delaware corporation with headquarters and a principal place of business located at 420 Alan Wood Road, Conshohocken, Pennsylvania.

5.      Defendant IKEA Holding US, Inc., through its subsidiary entities, owns defendant IKEA US Retail, LLC, and its subsidiary, IKEA North America Services, LLC.

6.      Defendant IKEA US Retail, LLC is a limited liability company with headquarters and a principal place of business located in Conshohocken, Pennsylvania.

7.      Defendant IKEA North America Services, LLC is a limited liability company with headquarters and a principal place of business located in Conshohocken, Pennsylvania.

8.      Defendants share common ownership, management, human resources, and employment policies.

9.      The IKEA Group, through its various owned and controlled subsidiary companies, including Defendants, holds itself out to the public and its employees in the United States as one company, referred to hereinafter as "IKEA US" or "Respondents."

10.     The employees of IKEA US, regardless of the payroll company from which their form W-2 is issued, are subject to the same, centrally controlled policies regarding human resources and employment matters.

11.     IKEA US is interconnected such that the entities that comprise it are considered a "single" and/or "integrated" employer, and/or "joint" employer.

12.     Defendants are alter-egos of each other, IKEA US and/or the IKEA Group.

13.     At all times material to this Statement of Claim, Defendants, individually and/or collectively, employed more than twenty (20) people and, in fact, IKEA US employs over 15,000 people in the United States.

14.     At all times material hereto, Defendants, individually and/or collectively, have been engaged in an industry affecting interstate commerce and have acted as an "employer" within the meaning of the ADEA.

15.     At all times material hereto, Plaintiff was been an employee of Defendants, individually and/or collectively, within the meaning of the ADEA.

FACTS

16.     As Commercial Manager, I was responsible for all commercial aspects of the store, including prep and flow, sales plan, steer merchandising basics, communication, and interior design, as well as product quality.

17.     I had worked at IKEA for more than twelve (12) years and had also held the positions of Logistics Manager (from 2007 to 2016) and Business Navigation/Operations Manager (from 2016 through 2017).

18.     In September of 2019 I had known for more than a year that I had a hernia which was going to require surgical intervention, the recovery from which was going to result in my temporary disability during recovery.

19.     I mentioned this fact to my store manager and direct supervisor, Sanjay Kumar ("Kumar") and that it was my intention not to schedule the surgery until February or March of 2020 which were typically slower periods for the store.

20.     On October 21, 2019 I received my annual performance appraisal in which I was told that I was meeting all standards.

21.     Based upon my performance evaluation, I was eligible for a pay increase in 2020 of 2.5% to 3.5%.

22.     In the fall of 2019 I was 51 years old and was the oldest member of the store's senior management team.

23.     I went to see my physician about the hernia only once in November of 2019.

24.     I went to see my physician about the hernia only once in December of 2019.

25.     At the point in time when I saw my physician in December, Kumar himself had been out of the store since prior to Thanksgiving of 2019.

26.     On December 3, 2019, Kumar told me he was terminating my employment "at will", allegedly because there was "not enough movement in the commercial areas of the store."

27.     I believe this excuse was pretextual, as at that point in time store sales were up year over year in every metric for which I was responsible as Commercial Manager.

28.     I believe this termination was discriminatory based upon my age (over 40) and upon my anticipating need for Family and Medical Leave as well as based upon IKEA regarding me as already disabled and/or attempting to avoiding having to accommodate me upon my recovery.

29.     I believe Kumar's explanation was pretextual because IKEA had treated other management employees who were under the age of 40 differently than he treated me.

30.     Respondent IKEA is a multinational company that has a corporate culture of age discrimination and age bias.

31.     IKEA openly expresses a preference in favor of young employees as the future leaders of the company.

32.     IKEA, among other things, has set age-biased personnel goals for management level employees.

33.     IKEA, among other things, has considered age in its employment decisions.

34.     IKEA, among other things, has tended to prefer younger individuals in management positions.

35.     IKEA has communicated its preference for young people in management positions throughout the entirety of its company, affiliates, and subsidiaries.

36.     IKEA's age bias from the top-down infuses and infects the employment decision-making process throughout its entirety.

37.     IKEA's age bias from the top-down infuses and infects the decisions regarding the discipline imposed on employees and the decision to terminate employees throughout its entirety.

38.     Since February 12, 2018, at least five current or former IKEA employees have filed age discrimination lawsuits against Defendants in the United States District Courts, alleging, among other things, that IKEA operating in the US considers age in its employment decisions and acts upon its openly expressed preference in favor of younger employees to the detriment of its older employees. The captions of these lawsuits are as follows:

    a.      *Donofrio v. IKEA US Retail, LLC* (E.D. Pa. No. 2: 18-cv-00599)

    b.      *Parker v. IKEA North America Services, LLC* (E.D. Pa. 2:18-cv-03261);

    c.      *Gorbeck v. IKEA North America Services, LLC, et al.* (E.D. Pa. 2: 18-cv-00599);

    d.      *Nasci v. IKEA North America Services, LLC* (W.D. Pa. 2:18-cv-01643); and

    e.      *Paine IKEA North America Services, LLC* (E.D. Pa. 2:19-cv--00723).

39.     Other similar claims are pending against IKEA before the EEOC and other agencies, such as *Devonshire v. IKEA et al.* (EEOC Docket Number 510-2020-03914).

40.     IKEA has engaged in systematic age discrimination against its Older Workers.

41.     IKEA has engaged in systematic discrimination against persons seeking to take Family and Medical Leave.

42.     IKEA has engaged in systematic discrimination against persons it regards as disabled, or apprehends will become disabled after surgical intervention.

43.     IKEA has engaged in a pattern and practice of age discrimination. Upon information and belief, and without limitation:

    a.      IKEA has had in place long term goals to have a younger management base and a certain number of younger individuals in management level positions. Every IKEA US store was directed that if it lost a member of its Store Steering Group, it was to fill the position with someone younger than 35. Specific goals of having a certain number of

younger employees in management positions were stated in writing by the US Strategic Human Resources Committee and communicated to every store throughout the United States. The goals have been spoken of and communicated in different ways, such as in terms of "age distribution goals," "succession," "potential" or "diversity."

b.      IKEA has tracked, monitored, and reported on its age-based personnel goals.

c.      IKEA has had in place a long-term strategy for recruiting and promoting younger people into management positions.

d.      IKEA has had in place leadership development programs as part of a strategy to advance young employees into management positions.

e.      IKEA has had in place a policy of identifying the "potential" of its employees as a proxy to assess promotability in an age-biased manner.

f.      IKEA has undertaken recruiting efforts aimed at disciplining young individuals less frequently and less severely.

g.      IKEA has implemented multiple "reorganization" efforts, including one entitled "Organizing for Growth" (a/k/a "O4G"), to remove older employees from management positions.

h.      IKEA managers openly express age bias in favor of younger employees.

i.      IKEA fails to remediate complaints of age discrimination, and thus promotes a culture in which discrimination against older employees is tolerated and encouraged.

j.      IKEA has expressly stated to all employees - including decisionmakers, applicants, potential applicants, and those charged with complying with its stated anti-discrimination policies - that it is "looking for young talents."

k.      IKEA openly flouts the ADEA and state anti-discrimination laws by, without limitation, publicizing advertisements for expressing a preference for "young" candidates, such as for its "Global Young Potentials Program."

l.      IKEA is more likely to discipline employees because of their age.

m.      IKEA is more likely to discipline older employees more severely than those employees under the age of 40.

n.      IKEA is more likely to terminate employees because of their age.

44.     IKEA employment policies and/or practices are infected with age bias from the top down and infuse all aspects of its employment decisions.

45.     IKEA's employment policies and/or practices, such as, without limitation, disciplining older employees more severely than those employees under the age of 40, and/or its consideration of age in employment decisions, have resulted in a statistically significant disparity in the termination rates of its Older Workers.

46.     IKEA's policies infected with age bias, its corporate culture of age bias, its open expression of considering age in employment decisions and decisions about discipline and termination of employees, affecting the employment decisions made by Respondent and thereby adversely affecting Respondent's older employees.

47.     IKEA's polices are infected with age bias, its corporate culture of age bias, its open expression of considering age in employment decisions and decisions about discipline and termination of employees, and/or its openly expressed preference for developing and/or selecting younger employees as its future leaders, at the expense of older employees..

48.     IKEA has since well prior to December of 2019 engaged in a pattern and practice of age discrimination against its Older Workers, including Plaintiff.

49.     IKEA has by its actions since well prior to December of 2019, and prior thereto, intentionally discriminated against Older Workers, including Plaintiff.

50.     IKEA' s policies and/ or practices have since at least December of 2019, and prior thereto, resulted in a disparate impact against Older Workers, including Plaintiff.

51.     IKEA has since at least December of 2019, and prior thereto, terminated older employees, because of age.

52.     IKEA has since at least December of 2019, and prior thereto, imposed greater discipline on older employees than employees who were younger than 40 to trim its workplace of older employees.

<u>LEGAL CLAIMS</u>

53.     I incorporate all prior paragraphs hereof as if set forth at length below.

54.     The Annotated Code of Maryland provides in pertinent part as follows:

> It is the policy of the State, in the exercise of its police power for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers to assure all persons equal opportunity in receiving employment and in all labor management–union relations, regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; and to that end, to prohibit discrimination in employment by any person.

State Government Article, §20-602, Annotated Code of Maryland

55.     I believe that I was terminated because of my age (over 40).

56.     I believe that persons not over the age of 40 were treated differently than I was.

57.     I believe that I was terminated because I was regarded as disabled, and/or, IKEA and Kumar did not want to have to accommodate any residual disability upon my return from surgery.

58.     I believe that other persons not over the age of 40 were treated more favorably than I was and not terminated.

- 8 -

59.     I believe there are no legitimate business explanations for my termination.

60.     I do not believe there was any bona fide occupational requirement which precluded my continuing in my position as Commercial Manager.

<u>CLAIM FOR RELIEF</u>

61.     I believe I am entitled to the following relief:

     (a)     Past lost earnings ("back pay")

     (b)     Future lost earnings ("front pay")

     (c)     Counsel fees

     (d)     Reinstatement to my initial position

     (e)     Appropriate equitable relief

     (f)     Such other damages as are permitted under the Annotated Code of Maryland, Title VII of the Civil Rights Act, as amended, and the Age Discrimination in Employment Act.

**I WISH TO HAVE MY CHARGE CROSS-FILED WITH THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION.**

LORI THOMPSON

Date:  May 27, 2020

## **VERIFICATION**

I, LORI THOMPSON, verify that I am the Charging Party in the above matter and that

the facts set forth in the foregoing Statement of Claim are true and correct to the best of my

knowledge, information and belief.  I understand that false statements contained therein are made

subject to any penalties relating to unsworn falsification to authorities.


LORI THOMPSON

Dated: 5/27/2020

Exhibit "B"

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA [ ] EEOC | 12F-2020-01016 |

| Maryland Commission on Civil Rights | and EEOC |
|---|---|

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Year of Birth |
|---|---|---|
| Ms. Lori Thompson | (410) 818-9540 | 1968 |

| Street Address | City, State and ZIP Code |
|---|---|
| 115 W Branch Street, Berlin, MD 21811 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| INGKA Group, LLC | 501+ | (610) 834-0180 |

| Street Address | City, State and ZIP Code |
|---|---|
| 400 Alan Wood Road, Conshohocken, PA 19428 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

| [ ] RACE | [ ] COLOR | [ ] SEX | [ ] RELIGION | [ ] NATIONAL ORIGIN |
|---|---|---|---|---|
| [ ] RETALIATION | [X] AGE | [X] DISABILITY | [ ] GENETIC INFORMATION | |
| [ ] OTHER | | | | |

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **12-03-2019**   Latest **12-03-2019**

[ ] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**Complainant contacted Maryland Commission on Civil Rights on May 29, 2020.**

Issue(s): Discharge

I believe that I was discriminated against based on my age and because I was "regarded" as disabled:

**Please See Attached Amended and Restated Statement of Claim**

I. I was a female employee at Respondent's College Park, Maryland store for more than twelve years.

II. While an employee, I regularly received good ratings as an employee, and even saved the company more than $100,000 when I discovered a mistake for which a different employee was responsible.

III. Nevertheless, after being told that I was going to require surgery for a medical condition several months hence, my store manager, Sanjay Kumar:
   a. Attempted to modify an annual review which Kumar's predecessor had already prepared for me to suggest that my performance was not as good as it had, in fact, been.
   b. When that did not work, Kumar terminated my employment.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

| 6/17/2020 | _(signature)_ | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
|---|---|---|
| Date | Charging Party Signature | |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA  [ ] EEOC | **12F-2020-01016** |

**Maryland Commission on Civil Rights** _____ and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

IV. IKEA has a longstanding policy which it has implemented to rid itself of managers older than 40, as reflected in other actions pending before other commissions and in other courts.

V. IKEA's termination of my employment was based upon bias against me because of my age and because I was "regarded" as disabled. By way of further detail, see attached Amended and Restated Statement of Claim.

I solemnly affirm under the penalty of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

MCCR Authorization_____ Date_____pw

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6/17/2020 *Date*    *Charging Party Signature* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

MARYLAND COMMISSION ON CIVIL RIGHTS

| | | |
|---|---|---|
| | : | |
| Lori Thompson | : | DOCKET NO. |
| | : | |
| v. | : | |
| | : | |
| INGKA GROUP, LLC | : | |
| doing business as IKEA | : | |
| | : | |

**AMENDED RESTATED STATEMENT OF CLAIM**

PARTIES

1.      My name is Lori Thompson.  I am a 52-year-old woman who up through and including December of 2019 was employed by IKEA in the position of "Commercial Manager" at IKEA's store located in College Park, Maryland.  I reside at 115 West Branch Street, Berlin, Maryland.

2.      "IKEA" is a multinational company that presents and promotes itself publicly as a centrally controlled entity known as the "INGKA Group, LLC."

3.      The INGKA Group, LLC operates in the United States through various owned and controlled subsidiary entities all of which do business as and present themselves as "IKEA," including, for example and without limitation, defendants IKEA Holding US, Inc., IKEA US Retail, LLC, and IKEA North America Services, LLC.

4.      For purposes of this charge, all of the subsidiaries, affiliates, and entities through which INGKA Group, LLC operates in the United States and the State of Maryland are hereinafter referred to as IKEA.

5.      IKEA's headquarters in the United States is situate in Conshohocken, Pennsylvania.

- 1 -

6.      Defendants share common ownership, management, human resources, and employment policies.

7.      The employees of IKEA, regardless of the particular entity or payroll company from which their form W-2 is issued, are subject to the same, centrally controlled policies regarding human resources and employment matters.

8.      IKEA is interconnected such that the entities that comprise it are considered a "single" and/or "integrated" employer, and/or "joint" employer.

9.      At all times material to this Statement of Claim, IKEA employed over 15,000 people in the United States.

10.      At all times material hereto, IKEA has been engaged in an industry affecting interstate commerce and have acted as an "employer" within the meaning of the ADEA.

11.      At all times material hereto, Plaintiff was been an employee of IKEA within the meaning of the ADEA, the ADA and the Annotated Code of Maryland.

<u>FACTS</u>

12.      As Commercial Manager, I was responsible for all commercial aspects of the store, including prep and flow, sales plan, steer merchandising basics, communication, and interior design, as well as product quality.

13.      I had worked at IKEA for more than twelve (12) years and had also held the positions of Logistics Manager (from 2007 to 2016) and Business Navigation/Operations Manager (from 2016 through 2017).

14.      Shortly before the end of the 2019 fiscal year, in or about the end of August of 2019, I personally and single-handedly negotiated a settlement between IKEA College Park and a third-party vendor XPO LOGISTICS ("XPO").

15.     The settlement was in the favor of IKEA and I was able to secure $118,000.00 payback from XPO to IKEA College Park for overbilling of assembly fees that took place over an extended period.

16.     Following this settlement, my store manager, Frank Briel ("Briel") thanked me personally for my work and due diligence multiple times and he lauded me and my results in front of the entire management team on at least three other occasions.

17.     Briel's last official day with IKEA College Park was 8/31/2019.

18.     Briel was replaced by Sanjay Kumar ("Kumar").

19.     Briel completed my performance evaluation in IKEA's personnel information system prior to his dismissal.

20.     In September of 2019 I had known for more than a year that I had a medical condition ("condition") which was going to require surgical intervention, the recovery from which was going to result in my temporary disability during recovery.

21.     The medical condition did not at that time in any way render me disabled, however post-surgically, I would be temporarily unable to perform the essential functions of my job for a brief period.

22.     I informed Kumar that it was my intention not to schedule the surgery until February or March of 2020 which were typically slower periods for the store.

23.     On October 21st 2019 Kumar the new store manager delivered my Performance Evaluation in which he accused me of being negligent in identifying the overbilling by XPO thereby costing IKEA lost profit, which is contrary to the foregoing facts.

24.     I insisted that Kumar remove that notation from my review as:

        a.      The allegation was untrue;

b.     The primary responsibility for researching and following up on billing questions was that of the Field Business Navigation Manager, not me;

c.     I had negotiated a settlement to IKEA's advantage even though IKEA's legal team had elected not to pursue a claim.

d.     The claim was completely inconsistent with Briel's prior praise for me for having addressed the situation that was not even in my area of responsibility.

25.     Briel denied that he had anything to do with Kumar's negative comments, which were based upon something that happened *before* Kumar was my manager and with which Kumar had nothing to do.

26.     Briel also confirmed that his completed review of my performance did not contain such criticism as Kumar manufactured.

27.     Kumar then agreed to remove his comments from my annual review, and the result was an annual review where overall I met standards and was entitled to a pay increase.

28.     Based upon my performance evaluation I was eligible for a pay increase in 2020 of 2.5% to 3.5%.

29.     In the fall of 2019 I was 51 years old and was the oldest member of the store's senior management team.

30.     I went to see my physician about the condition only once in November of 2019.

31.     I went to see my physician about the condition only once in December of 2019.

32.     At the point in time when I saw my physician in December, Kumar himself had been out of the store since prior to Thanksgiving of 2019.

33.     On December 3, 2019, Kumar told me he was terminating my employment "at will", allegedly because there was "not enough movement in the commercial areas of the store."

- 4 -

34.     I believe this excuse was pretextual, as at that point in time store sales were up year over year in every metric for which I was responsible as Commercial Manager.

35.     I believe the excuse was pretextual because Kumar had clearly wanted to "blame" me for the problem which had been under the purview of another employee outside the store who did not report to me.

36.     I believe this termination was discriminatory based upon my age (over 40) and upon my anticipating need for Family and Medical Leave as well as based upon IKEA regarding me as already disabled and/or attempting to avoiding having to accommodate me upon my recovery.

37.     I believe Kumar's explanation was pretextual because IKEA had treated other management employees who were under the age of 40 differently than he treated me.

38.     Respondent IKEA is a multinational company that has a corporate culture of age discrimination and age bias.

39.     IKEA openly expresses a preference in favor of young employees as the future leaders of the company.

40.     IKEA, among other things, has set age-biased personnel goals for management level employees.

41.     IKEA, among other things, has considered age in its employment decisions.

42.     IKEA, among other things, has tended to prefer younger individuals in management positions.

43.     IKEA has communicated its preference for young people in management positions throughout the entirety of its company, affiliates, and subsidiaries.

44.     IKEA's age bias from the top-down infuses and infects the employment decision-making process throughout its entirety.

45.     IKEA's age bias from the top-down infuses and infects the decisions regarding the discipline imposed on employees and the decision to terminate employees throughout its entirety.

46.     Since February 12, 2018, at least five current or former IKEA employees have filed age discrimination lawsuits against Defendants in the United States District Courts, alleging, among other things, that IKEA operating in the US considers age in its employment decisions and acts upon its openly expressed preference in favor of younger employees to the detriment of its older employees. The captions of these lawsuits are as follows:

a.     *Donofrio v. IKEA US Retail, LLC* (E.D. Pa. No. 2: 18-cv-00599)

b.     *Parker v. IKEA North America Services, LLC* (E.D. Pa. 2:18-cv-03261);

c.     *Gorbeck v. IKEA North America Services, LLC, et al.* (E.D. Pa. 2: 18-cv-00599);

d.     *Nasci v. IKEA North America Services, LLC* (W.D. Pa. 2:18-cv-01643); and

e.     *Paine IKEA North America Services, LLC* (E.D. Pa. 2:19-cv--00723).

47.     Other similar claims are pending against IKEA before the EEOC and other agencies, such as *Devonshire v. IKEA et al.* (EEOC Docket Number 510-2020-03914).

48.     IKEA has engaged in systematic age discrimination against its Older Workers.

49.     IKEA has engaged in systematic discrimination against persons seeking to take Family and Medical Leave.

50.     IKEA has engaged in systematic discrimination against persons it regards me as disabled, or apprehends that I will become disabled after surgical intervention.

51.     IKEA has engaged in a pattern and practice of age discrimination. Upon information and belief, and without limitation:

a.     IKEA has had in place long term goals to have a younger management base and a certain number of younger individuals in management level positions. Every IKEA

US store was directed that if it lost a member of its Store Steering Group, it was to fill the position with someone younger than 35. Specific goals of having a certain number of younger employees in management positions were stated in writing by the US Strategic Human Resources Committee and communicated to every store throughout the United States. The goals have been spoken of and communicated in different ways, such as in terms of "age distribution goals," "succession," "potential" or "diversity."

b.      IKEA has tracked, monitored, and reported on its age-based personnel goals.

c.      IKEA has had in place a long-term strategy for recruiting and promoting younger people into management positions.

d.      IKEA has had in place leadership development programs as part of a strategy to advance young employees into management positions.

e.      IKEA has had in place a policy of identifying the "potential" of its employees as a proxy to assess promotability in an age-biased manner.

f.      IKEA has undertaken recruiting efforts aimed at disciplining young individuals less frequently and less severely.

g.      IKEA has implemented multiple "reorganization" efforts, including one entitled "Organizing for Growth" (a/k/a "O4G"), to remove older employees from management positions.

h.      IKEA managers openly express age bias in favor of younger employees.

i.      IKEA fails to remediate complaints of age discrimination, and thus promotes a culture in which discrimination against older employees is tolerated and encouraged.

j.      IKEA has expressly stated to all employees - including decisionmakers, applicants, potential applicants, and those charged with complying with its stated anti-discrimination policies - that it is "looking for young talents."

k.      IKEA openly flouts the ADEA and state anti-discrimination laws by, without limitation, publicizing advertisements for expressing a preference for "young" candidates, such as for its "Global Young Potentials Program."

l.      IKEA is more likely to discipline employees because of their age.

m.      IKEA is more likely to discipline older employees more severely than those employees under the age of 40.

n.      IKEA is more likely to terminate employees because of their age.

52.      IKEA employment policies and/or practices are infected with age bias from the top down and infuse all aspects of its employment decisions.

53.      IKEA's employment policies and/or practices, such as, without limitation, disciplining older employees more severely than those employees under the age of 40, and/or its consideration of age in employment decisions, have resulted in a statistically significant disparity in the termination rates of its Older Workers.

54.      IKEA's policies infected with age bias, its corporate culture of age bias, its open expression of considering age in employment decisions and decisions about discipline and termination of employees, affecting the employment decisions made by Respondent and thereby adversely affecting Respondent's older employees.

55.      IKEA's polices are infected with age bias, its corporate culture of age bias, its open expression of considering age in employment decisions and decisions about discipline and termination of employees, and/or its openly expressed preference for developing and/or selecting younger employees as its future leaders, at the expense of older employees..

56.     IKEA has since well prior to December of 2019 engaged in a pattern and practice of age discrimination against its Older Workers, including Plaintiff.

57.     IKEA has by its actions since well prior to December of 2019, and prior thereto, intentionally discriminated against Older Workers, including Plaintiff.

58.     IKEA' s policies and/ or practices have since at least December of 2019, and prior thereto, resulted in a disparate impact against Older Workers, including Plaintiff.

59.     IKEA has since at least December of 2019, and prior thereto, terminated older employees, because of age.

60.     IKEA has since at least December of 2019, and prior thereto, imposed greater discipline on older employees than employees who were younger than 40 to trim its workplace of older employees.

## LEGAL CLAIMS

61.     I incorporate all prior paragraphs hereof as if set forth at length below.

62.     The Annotated Code of Maryland provides in pertinent part as follows:

> It is the policy of the State, in the exercise of its police power for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers to assure all persons equal opportunity in receiving employment and in all labor management–union relations, regardless of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment; and to that end, to prohibit discrimination in employment by any person.

State Government Article, §20-602, Annotated Code of Maryland

63.     I believe that I was terminated because of my age (over 40).

64.     I believe that persons not over the age of 40 were treated differently than I was.

65.     I believe that I was terminated because I was regarded as disabled, and/or, IKEA and Kumar did not want to have to accommodate any residual disability upon my return from surgery.

- 9 -

66.     I believe that other persons not over the age of 40 were treated more favorably than I was and not terminated.

67.     I believe there are no legitimate business explanations for my termination.

68.     I do not believe there was any bona fide occupational requirement which precluded my continuing in my position as Commercial Manager.

<u>CLAIM FOR RELIEF</u>

69.     I believe I am entitled to the following relief:

(a)     Past lost earnings ("back pay")

(b)     Future lost earnings ("front pay")

(c)     Counsel fees

(d)     Reinstatement to my initial position

(e)     Appropriate equitable relief

(f)     Such other damages as are permitted under the Annotated Code of Maryland, Title VII of the Civil Rights Act, as amended, and the Age Discrimination in Employment Act.

**I WISH TO HAVE MY CHARGE CROSS-FILED WITH THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION.**

LORI THOMPSON

Date amended and restated:  June 17, 2020

# Procedural Checklist

## To the Complainant*:

> \* You have just filed a charge of discrimination. You have sworn under oath, that you believe the respondent has discriminated against you on one or more bases that Title 20 of the State Government Article, Annotated Code of Maryland (hereinafter "Title 20"), the civil rights statute of the state of Maryland, protects. The State of Maryland Commission on Civil Rights investigates complaints of discrimination in the areas of employment, housing and public accommodation.
>
> Specifically, charges filed by complainants in the area of employment may claim they have been harmed because of their race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, disability, genetic information and/or in retaliation for participating in or protesting a protected activity, (e.g., example complaining about race discrimination).
>
> In the area of housing, a discrimination complaint may be filed on the bases of race, color, religion, sex, familial status, national origin, marital status, sexual orientation, gender identity, or disability.
>
> Public accommodations charges may be filed on the bases of race, sex, age, color, creed, national origin, marital status, sexual orientation, gender identity, or disability.
>
> \* You should have a clear understanding about what is happening, what to expect and who to contact during the investigation of your charge. This checklist is provided for your reference and as a tool to guide you through the MCCR process. Though we have tried to include each procedure, please feel free to ask for more information if you need it.
>
> \* A MCCR staff member will review this document with you during the intake process. Please acknowledge that you understand the information below, by initialing the appropriate paragraphs and signing and dating the bottom of the last page. MCCR staff will give you a copy of this document.

## RE: SERVICE

___LAT___ I understand that the Commission's staff will provide notice of my complaint by serving a copy of my complaint upon the Respondent shortly after the date of filing.

___LAT___ I understand that once my charge is served my case will be scheduled for a Fact Finding Conference.

___LAT___ Once assigned to an investigative division, the investigator will request information from the Respondent. Because the Respondent frequently requires additional time to respond to the Agency's

requests for information, a period of time may elapse prior to my receiving contact from an investigator.

## RE: CONTACT WITH THE COMMISSION

__IAT__ I further understand that it is my responsibility to keep the Commission's staff informed of any changes in my address and/or telephone number. It is also my responsibility to provide staff with the name and telephone number of someone who has a telephone number that is different from my own, who will always know how to reach me. I may report changes to the agency at (410) 767-8600 or (800) 637-6247.

__IAT__ I understand that I may amend my charge to add a basis or an issue as long as additional acts which constitute discriminatory practices under Title 20 relate to the subject matter of the original complaint.

__IAT__ I understand that the MCCR will notify me by mail once the complaint has been assigned to an investigative unit. This notice will contain the name, telephone number, and e-mail address of the investigator. I understand that I may contact the supervisor if an emergency arises or additional information becomes available.

## RE: THE INVESTIGATION

__IAT__ I understand that the investigator is a neutral party (not an advocate) assigned to investigate all sides of the allegations in order to prepare an impartial finding of fact (a report) in my case.

__IAT__ I understand that during an investigation, evidence that supports or refutes my claim will be gathered and reviewed. The investigator will determine what evidence is needed, and based on legal analysis, whether it is likely that discrimination occurred. The investigator will also interview witnesses to the alleged act(s) of discrimination. In some cases, the investigator will visit the site where the alleged violation occurred.

__IAT__ If I receive a No Probable Cause decision, I may file a Request for Reconsideration of the decision by writing to Cleveland L. Horton II, Deputy Director, Maryland Commission on Civil Rights, 6 St. Paul Street, Suite 900, Baltimore, Maryland 21202. I must do so within fifteen (15) days of the date that the decision was issued. Once my case is reviewed, my case will either be returned to the investigator for further investigation or closed by the MCCR.

__IAT__ If I receive a Probable Cause decision, the investigator will attempt to conciliate (settle) the matter by determining the appropriate remedies available under the law and preparing a Conciliation Agreement for the parties' signatures. If the Respondent fails to conciliate the matter, the case is then recommended for public hearing.

**RE: DISABILITY ISSUES**

_WT_ I have signed a release of information to permit the MCCR to obtain medical records relative to my claim.

_WT_ To the best of my knowledge, I am qualified to perform the essential functions of the job in question, with or without an accommodation. I further understand that it is my responsibility to request of my employer a reasonable accommodation if I need one to be able to perform the essential functions of the job.

_WT_ I understand the concept of a reasonable accommodation.

**RE:    POSSIBLE OUTCOMES**

_WT_ I understand that the results of the staff's investigation will be set forth in a written report which will chronicle the facts found to exist and the conclusions drawn. The findings will be served on (sent to) all parties to the complaint. The Commission's staff will determine whether, based on the totality of factual circumstances known at the time of the decision, probable cause or no probable cause exists to believe that a discriminatory act has occurred. Depending on the complexity of the case, it is difficult to give an exact time when the investigation of a complaint will be concluded.

_WT_ I understand that at any time before the issuance of a written finding of facts, the parties may enter into a negotiated settlement. If successful, this will result in a written agreement setting forth the terms of the settlement and the withdrawal of the complaint.

_WT_ I understand that I may withdraw my complaint at any time by completing the MCCR withdrawal form. My investigator will provide me this form upon request.

_WT_ I understand that the Commission may administratively close my case under circumstances which may include the absence of information that establishes my whereabouts, the determination that statutory requisites have not been met, or my failure to cooperate with the requests of Commission staff.

_WT_ I understand that upon receipt of a No Probable Cause Written Finding pertaining to a housing charge filed under Title VIII and/or Title 20, if I am not satisfied that the Maryland Commission on Civil Rights (MCCR) has thoroughly investigated my case, I have the right to file a Request for Reconsideration of the determination in writing to Cleveland L. Horton II, Deputy Director, Maryland Commission on Civil Rights, 6 St. Paul Street, Suite 900, Baltimore, Maryland 21202. I must do so within fifteen (15) days of the date that the decision was mailed. Once my case is reviewed, my case will either be returned to the investigator for further investigation or closed by the MCCR.

_WT_ I understand that upon receipt of a No Probable Cause Written Finding pertaining to an

Page 3 of 4

employment charge filed under the Title VII, ADEA and/or Title 20 federal and state statutes, or an appeal thereof, I may request that the Equal Employment Opportunity Commission (EEOC) perform a "substantial weight review" of my case. I may exercise this right of review if I am not satisfied that the Maryland Commission on Civil Rights (MCCR) has thoroughly investigated my case. I must file this written request for review with the EEOC within fifteen (15) days of receipt of the finding. I also understand that if I am not satisfied that the Maryland Commission on Civil Rights (MCCR) has thoroughly investigated my case, I have the right to file a Request for Reconsideration of the determination in writing to Cleveland L. Horton II, Deputy Director, Maryland Commission on Civil Rights, 6 St. Paul Street, Suite 900, Baltimore, Maryland 21202. I must do so within fifteen (15) days of the date that the decision was mailed. Once my case is reviewed, my case will either be returned to the investigator for further investigation or closed by the MCCR.

_LAT_ I understand that I may request a "Notice of Right to Sue" letter from the EEOC. The "Notice of Right to Sue" will enable me to take my case directly to federal court. I may obtain the "Notice of Right to Sue" by writing Kurt Jung, State and Local Program Manager, EEOC, 801 Market Street, Suite 1300, Philadelphia, PA 19107. Once approved, the EEOC will issue me a "Notice of Right to Sue" letter. I then have ninety days to file in court and should have secured legal counsel to assist me. I understand that this right is applicable only in cases involving a violation of Title VII.

> The foregoing procedures are by no means exhaustive, but reflect answers to the questions our Complainants ask most frequently.

Case Name: Thompson, Lori vs. INGKA Group, LLC
Case Number: 12F-2020-01016

Signature: _[signature]_ Date: _6/17/2020_

Page 4 of 4