IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LORI THOMPSON, | ) | |
| | ) | CIVIL ACTION |
| Plaintiff, | ) | |
| | ) | No. 21-05288 |
| v. | ) | |
| | ) | |
| IKEA US RETAIL LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION AND PROCEDURAL HISTORY**

On December 3, 2019, Plaintiff was terminated from her position as Commercial Manager, a senior managerial position, at the IKEA retail store located in College Park, Maryland ("IKEA College Park"). The undisputed evidence confirms she was terminated because the Store Manager determined Plaintiff's commercial team was not functioning properly due to deficits with her leadership. Specifically, there was low morale and engagement and poor ways of working amongst the team, and it was apparent a change in leadership was necessary.

Plaintiff now claims, with no supporting evidence and based entirely on her subjective belief, that IKEA violated the Family and Medical Leave Act 29 U.S.C. § 2601 et seq. ("FMLA") (Count I), the Age Discrimination in Employment Act 29 U.S.C. § 623, et seq. ("ADEA") (Count II), and the Maryland Fair Employment Practices Act Md. Code Ann. State Gov't § 20-602 et seq. ("MFEPA") (Count III). The evidence, however, is so one-sided that Defendant IKEA US RETAIL LLC ("IKEA" or "Defendant") must prevail as a matter of law. IKEA is entitled to summary judgment on Plaintiff's FMLA retaliation claim because she failed to invoke FMLA leave and there is no causal link between her "notifying" IKEA of her intention to take leave and

her termination.  Plaintiff's Age Discrimination and MFEPA claims also fail because discovery revealed no circumstantial evidence that raises an inference of age discrimination.  Additionally, Plaintiff cannot establish pretext or prove by a preponderance of the evidence that age was the 'but-for' cause for her termination.

## II.     SUMMARY OF MATERIAL UNDISPUTED FACTS

Plaintiff, born in April 1968, was hired by IKEA College Park as a Logistics Manager in March 2007.  Ex. H, Complaint, at ¶¶ 2, 20.  She held this position until 2016, when she became Interim Operations Manager until 2017.  *Id.* at ¶ 20.  Following this interim assignment, Plaintiff was promoted to Commercial Manager.  *Id.* at ¶ 2.

### A.  Plaintiff's Employment as Commercial Manager at IKEA College Park

IKEA is a home furnishing retailer that offers a wide range of functional, well-designed furniture and other home products at affordable prices.  The IKEA vision is to "create a better everyday life for the many people," including its co-workers.[1]

Plaintiff became Commercial Manager for IKEA College Park following a reorganization at IKEA known as Organizing for Growth ("O4G").  *Id.* at ¶ 1.  As Commercial Manager, Plaintiff was in charge of all commercial aspects of the store, including preparation and flow, sales plan, steering merchandising basics, communication, interior design, and product quality.  *Id.* at ¶ 19. Along with these duties, she was also responsible for driving sales and optimizing profitability. Ex. A, Thompson Dep. at 126:24-127:8.  For most of her tenure as Commercial Manager, she reported to the Store Manager Frank Briel ("Briel").  *Id.* at 57:15-17, 230:5-8.  Plaintiff confirmed Briel was an honest person and a fair manager. *Id.* at 126:19-23.

---

[1]   IKEA refers to its employees as co-workers.

The annual review process at IKEA operates in three parts: 1) the Start-Up Talk, 2) the Follow-Up Talk, and 3) the Performance Review.  Ex. B, Kumar Dep. at 96:7-25. The process begins on September 1st, the beginning of the IKEA fiscal year.  *Id.*  During Plaintiff's FY 18 Start-Up Talk, one comment by Briel stated, "Continue to develop James,[2] accepting just because he has a different view doesn't mean he is wrong.  Work thru your frustrations, giving him the silent treatment is not productive."  Ex. C at IKEA 000723.  Another comment noted, "Lori will develop the business but at what cost.  While she might encourage and challenge coworkers she often leads thru force. She won't be able to take more responsibilities until she can admit her mistakes and identify her weaknesses.  Her obsession to remain perfect drives people away from her."  *Id.* at IKEA 000726.

Briel prepared Plaintiff's FY 2018 Performance Review.  *Id.* at IKEA 000722; Ex. A at 130:7-9. In this review, Briel commented on a number of areas Plaintiff needed to improve.  *Id.* First, Plaintiff needed to learn to admit her weaknesses, stop being too competitive, and ask for help when needed.  The review noted that Plaintiff's peers had given up on this happening.  *Id.* Briel cautioned that until Plaintiff could learn to admit her mistakes, she would always have a contentious relationship with her boss and peers.  *Id.*  Second, Briel indicated people were tired of walking on eggshells around her.  *Id.*  Third, Briel believed Plaintiff was "clearly two people", and one of them is a bully.  *Id.*  Finally, Briel concluded with his observation that Plaintiff could not deliver a message without being negative.  *See* Ex. A. at 130:7-131:20, 141:7-15.  *See also* Ex. C at IKEA 000725.

---

2   Another IKEA co-worker.

During this same Performance Review, Plaintiff received only a "Partly Meets Expectations" for "[e]stablishes and maintains service agreements with internal stakeholders and external partners in order to protect operational standards and help safeguard the IKEA culture and brand." Ex. C at IKEA 000722. She received the same review for "[g]athers and translates insights from home visit interviews into locally relevant, functional, aesthetic and commercial home furnishing solutions that exceed customer expectations and reflect home furnishing the IKEA way." *Id.* at IKEA 000723. After reviewing with Briel, Plaintiff signed the Performance Review and did not dispute its accuracy. *Id.* at IKEA 000722; Ex. A at 142:17-19.

During her Start-Up Talk for the following year's annual review process, Plaintiff requested bi-weekly meetings with Briel in order "to address [her] shortcomings as they happen" and help her work "to improve [her] leadership." Ex. D at IKEA 000752. Later, in May 2019, Thompson participated in a training called "Leading the Commercial Agenda" to help her better understand and implement the commercial priorities. Ex. G. She was also selected to participate in a leadership program ("My Conscious Leadership") to improve the effectiveness of her leadership. *Id.*

**B.  XPO Logistics Settlement**

Around the end of fiscal year 2019, sometime in August, according to Plaintiff it was discovered a third-party vendor, XPO Logistics ("XPO") was overbilling IKEA for assembly fees that took place over an extended period of time.  Allegedly, Plaintiff "personally and single-handedly" negotiated a settlement between IKEA College Park and XPO to resolve this dispute. *See* Ex. H at ¶ 21.  Following this incident, Plaintiff stated Briel was "singing [her] praises" for all the extra work she did in securing the settlement. Ex. A at 41:18-24.

4

### C. **Sanjay Kumar Becomes Store Manager at IKEA College Park**

On September 1, 2019, Sanjay Kumar ("Kumar") started as the Store Manager of IKEA College Park, replacing Briel.  *See* Ex. B. at 16:6-13.  During Briel's tenure at IKEA College Park, Briel was known at IKEA as a "VAPS" Manager.  *See id.* at 59:24-60:4.  VAPS stands for "Value Added Participation Store", and VAPS Managers have partial ownership interest in the stores they manage, giving them extra incentive to meet certain sales targets.  *Id.* at 14:5-9.   Briel departed IKEA College Park after his VAPS term expired, which usually lasts around six years.  *Id.* at 59:24-60:5.

Before his departure, Briel completed Plaintiff's FY 19 Performance Review, however Kumar signed and reviewed it with her and outlined his clear expectations of Plaintiff.  *See* Ex. A. at 37:24-38:9; Ex. B at 101:18-102:1, 149:18-21.  This Performance Review included reference to the XPO settlement.  *See* Ex. A. at 37:1-24.  Instead of being positive, the review stated Plaintiff should have caught XPO's overbilling earlier and therefore was negligent in her handling of the situation.  *Id.* at 40:21-41:4.  Based on her prior experience with Briel, and his supposed praise of the XPO settlement, Plaintiff thought this critique was improper and asked that it not be included in her Performance Review.  *Id.* at 41:5-9.  Kumar agreed to remove it because he did not see it as an issue.  Ex. B 102:5-13.

This Performance Review again revealed Plaintiff's leadership deficiencies.  *See* Ex. D. For instance, it stated Plaintiff needed to "[t]ake a more positive approach to the day to day business" and "[t]reat others in a professional way . . . [and] not alienate members of [her] own team."  *Id.* at IKEA 000744-45. Plaintiff received a "Partly Meets Expectations" on "[o]ptimizes sales and profitability in the store using the knowledge of the range, local market, competition, and customers in any channel."  *Id.* at IKEA 000741.  She received another "Partly Meets

Expectations" on "[e]nables the IKEA mechanical sales system to work efficiently and ensures the continued success of the IKEA concept." *Id.*

Further, Kumar outlined his clear expectations for Plaintiff in the FY 19 Performance Review. These expectations included following up on deadlines and establishing clear expectations for her team members. *Id.* at IKEA 000748. He additionally gave specific items that needed strategies in place, noting if these "basic strategies" are not in place, "nothing will move forward." *Id.* Finally, the expectations stated that "[h]ow the Commercial team operates within itself and how it partners with others needs to change. . . . We need to partner with other departments rather than expecting them to do whatever we need." *Id.* After removal of the reference to the XPO logistics situation, Plaintiff signed the Performance Review and did not dispute it. *Id.* at IKEA 000741. *See also* Ex. A at 43:9-11.

In October 2019, IKEA College Park Store had a business navigation review. Ex. A at 207:21-24; Ex. I. The purpose of the business navigation review is to support the commercial team to drive sales and maximize opportunity. Ex. B at 58:4-7, 76:18-77:2. Part of this review required Plaintiff's commercial team executing on its portion of the review. *Id.* at 81:12-22. The store scored a disconcerting 41 percent, well below the passing score of 75 percent. *Id.* at 208:23-209:8. Some of the issues included, but were not limited to, layout, range groupings, retail foundation, sales steering, and commercial messages. Ex. A at 180:20 – 181:3. Based on this score, Plaintiff admitted the store needed "improvement" and it had "things to work on". *Id.* at 209:2-8; 11-16. Moreover, Plaintiff acknowledged Kumar had previously requested that she ensure the commercial team was prepared for the review. *Id.* at 158:1-8; 159:20-160:2.

### D. **Plaintiff's Conversation with Kumar**

Sometime between September 11 and September 28, 2019, Plaintiff alleges she had a conversation with Kumar where she told him she needed surgery. *Id.* at 24:17-24; 25:1-23. No one else was present for this conversation, and Plaintiff did not inform any other member of senior management that she was going to need surgery. *Id.* at 27:1-4. Because the store was usually slower in February or March, Plaintiff claims she told Kumar she was planning on scheduling her surgery for then. *Id.* at 24:17-21. Plaintiff, however, did not tell Kumar how long she planned to be out or whether she planned to take paid time off ("PTO"), sick time, or FMLA leave. *Id.* at 27:5-8; 28:9-13. Indeed, Plaintiff conceded Kumar could have interpreted her statement to mean she planned on using PTO or sick time. *Id.* at 28:4-10; 83:16-21. Moreover, Plaintiff admitted Kumar would be unaware of what type of leave she sought until after her surgery was performed. *Id.* at 27:17-24.

At her deposition, Plaintiff asserted Kumar's response to her comment was simply stating "Okay", and that Kumar did not seem upset. *Id.* at 25:24-26:7. Afterward, they continued their conversation, moving on to other topics. *Id.* at 26:4-7. Plaintiff also admitted that IKEA College Park could operate without her working in the store—demonstrating Kumar would have no animus towards Plaintiff taking any future leave. *Id.* at 74:22-24. IKEA unambiguously articulates in its FMLA Notice that in order to qualify for FMLA leave, the co-worker must notify IKEA in writing of their need for leave. Ex. E at IKEA 000488. Plaintiff understood she could not orally obtain FMLA leave. *See* Ex. A at 82:23-83:5.

### E. **Plaintiff's Termination**

Plaintiff was terminated on December 3, 2019—more than two months after the discussion with Kumar about her need to take time off. Ex. G; Ex. H at ¶ 41. Kumar made the decision to

terminate Plaintiff.  Prior to terminating Plaintiff, however, Kumar received approval from Market Area People & Culture[3] Manager Laura Pena, IKEA College Park Unit People & Culture Manager Jonathan Padmore, and Market Area Manager Selwyn Crittendon—Kumar's supervisor.  None of these individuals were aware of Thompson's comment to Kumar about taking time off.  Kumar also consulted with the IKEA legal team.  Ex. B at 33:21-34:21, 52:17-53:20.

The rationale behind Plaintiff's termination is well-documented in her Corrective Actions Form, dated the same day as her termination.  Ex. G.  Kumar had determined the commercial team at IKEA College Park "is and has been underperforming at a level that cannot be sustained for success of the co-worker and business."  *Id.* at IKEA 000084.  He elaborated that since becoming Store Manager, he had "seen no progress in development of the commercial team that will lead to long-term success" and no progress improving the merchandising basics of the store.  *Id.* Moreover, "[f]eedback from co-workers, leaders, managers, and field/SO partners as well as [Kumar]'s own observations are that the departments within the commercial team are not functioning properly due to deficits in leadership, expectations, and vision, and execution of routines."  *Id.*

The Corrective Action continues that "[t]he negative impact to our co-worker population and to our business is evidenced through the lack of structure, expectations, and leadership.  This resulted in a commercial team . . . with low morale, high stress, and poor ways of working."  *Id.* Kumar goes on to explain that, at the beginning of the year, sales for the IKEA College Park store were on par to meet goal.  However, "[a]s a result of the failure of the commercial team to execute

---

[3] IKEA refers to its Human Resources Department as "People & Culture."

the basics in a timely manner and raise the base from a co-worker moral perspective, we are now more than $500,000 behind our goal and continue to face missed-sales opportunities." *Id.*

At his deposition, Kumar reiterated all these reasons, stating Plaintiff was terminated because the commercial team was performing poorly, there was low morale, engagement, and poor ways of working. Ex. B at 126:2-10. Based on the feedback he received from others and his own observations, it was apparent a leadership change needed to be made in order for the store to be successful moving forward. *Id.*

During her deposition, Plaintiff took issue with the fact she was terminated without Kumar having a conversation with her regarding her performance issues. Ex. A at 62:10-20. The IKEA Corrective Action Policy, however, states that "[w]hen IKEA believes a co-worker's performance is unacceptable or violates rules, the severity of any corrective action, up to including termination, falls within the Company's sole discretion." Ex. F at IKEA 000498. Thus, IKEA does not maintain a "progressive disciplinary policy" that requires verbal and written warnings prior to termination. *See* Ex. B at 41:1-18. Instead, the Corrective Action Policy leaves considerable discretion up to the Store Manager when it comes to the severity of any corrective action when a co-worker fails to meet expectations. *See* Ex. A at 165:15-24. Simply put, no pre-termination conversations regarding performance are required under the IKEA Corrective Action Policy.

Plaintiff admitted at her deposition she would have to "speculate" as to how an objective third-party could believe she was terminated because of her age. *Id.* at 85:12-18. Moreover, Plaintiff conceded her belief she was terminated because of her age is not based on any facts and is instead exclusively based on her subjective belief. *Id.* at 64:18-21.

### III.   <u>STANDARD OF REVIEW</u>

The summary judgment standard has been satisfied, and Defendant's motion should be granted.  A court should grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In reaching this decision, the court must determine whether 'the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  *Round v. City of Philadelphia*, No. 19-3513, 2022 WL 2916681, at *8 (E.D. Pa. July 22, 2022) (quoting *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010)) (Slomsky, J).

A factual dispute is considered "genuine" if there is evidence in the record that would permit a reasonable jury to find for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is considered "material" if it might affect the outcome of the case under applicable substantive law, meaning that the fact is relevant to determinative issues.  *Id.*  In contesting a motion for summary judgment, the nonmoving party is prohibited from relying "merely upon bare assertions, conclusory allegations, or suspicions."  *Fireman's Ins. Co. of Newark, NJ v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).

### IV.   <u>ARGUMENT</u>

#### A.  <u>Plaintiff's FMLA Retaliation Claim Fails as a Matter of Law</u>

Plaintiff cannot prevail on her FMLA retaliation claim[4].  To succeed on an FMLA retaliation claim, Plaintiff must prove: 1) she invoked her rights to FMLA-qualifying leave; 2) she suffered an adverse employment decision, and 3) the adverse action was casually related to her

---

[4] FMLA claims predicated on an employee's termination are construed as retaliation claims.  *See Stephenson v. JLG Indus.*, No. 09-1643, 2011 WL 1304625, at *5 (M.D. Pa. Mar. 31, 2011).

invocation of rights.  *Lichenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir. 2012).  Plaintiff's claim must fail because no reasonable jury could find she invoked her right to FMLA leave or that the decision to terminate her was causally related to her supposed invocation of these rights.  Moreover, even if Plaintiff could establish a *prima facie* case for FMLA retaliation, she offers no evidence to rebut the legitimate, non-retaliatory reasons IKEA had for terminating her employment.

> **1.  Plaintiff cannot prevail on her FMLA retaliation claim because she did not provide IKEA with adequate notice of her need to take FMLA leave.**

To invoke rights under the FMLA, an employee must provide adequate notice to their employer about their need to take FMLA leave.  *Lichenstein*, 691 F.3d at 303.  To provide such notice, an employee "shall provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. 825.303(b).  While it is unnecessary for the employee to cite to the FMLA, they must provide reasonably adequate information under the circumstances to understand the employee seeks leave under the FMLA.  *Samkowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007).  The "critical test" is "not whether the employee gave every necessary detail to determine if the FMLA applies, but how the information conveyed to the employer is reasonably interpreted."  *Id.*

Here, Plaintiff did not convey the necessary information to put IKEA on notice that she would take FMLA leave.  Plaintiff asserts the brief conversation she had with Kumar in September 2019 is sufficient to put IKEA on notice that she was going to seek FMLA leave in the future.  During her deposition, however, Plaintiff indicated she merely told Kumar she needed surgery and was planning on scheduling it for February or March 2020 because that was typically a slower period for the store.  *See* Ex. A at 24:17-20; 25:5-11.  Plaintiff did not tell Kumar how long she intended to be out for her surgery or the duration of any possible recovery time.  *Id.* at 27:5-8.

Further, she conceded Kumar could have interpreted her statement to mean she only planned on taking PTO or sick time.  Plaintiff even admitted Kumar would not know what type of leave she would be taking for surgery "until that surgery happened."  *Id.* at 27:17-24.  Finally, IKEA unambiguously articulates in its FMLA Notice that in order to qualify for FMLA leave, a co-worker must notify IKEA in writing of their need for leave.  Ex. E.  Plaintiff knew she could not orally obtain FMLA leave.  *See* Ex. A at 82:23-83:5.  Based on his discussion with Plaintiff, Kumar was only aware that Plaintiff "needed to take time off for something health-related".  Ex. B at 67:12-25.

Our case is factually analogous to *Gardiner v. City of Philadelphia*, 809 F. App'x. 92, 96 (3d Cir. 2020).  In *Gardiner*, the plaintiff sent her supervisor an email that stated: "With me being in a stressful work environment and having other medical issues, my doctor wants me to take sick leave for a few days.  I am hoping to return back to work sometime next week."  *Id.* at 94.  Other than sending this email, the plaintiff did not discuss her medical issues with anyone or seek leave from the Human Resources Department.  *Id.* at 96.  The Third Circuit, affirming summary judgment in favor of the employer, determined this email did not constitute adequate notice under the FMLA.  *Id.*  First, the email only said that she would be taking "sick leave" because of the "stressful work environment" and "other medical issues" and that she would return the following week.  Second, the email did not indicate what the "other medical issues" were.  *Id.*  Third, the plaintiff had not discussed her medical issues with the employer's Human Resources Department. *Id.*

The same holds true here.  Plaintiff acknowledged during her deposition that she is not aware if she told any other management-level employee, let alone anyone from the IKEA People & Culture Department, that she intended to have hernia surgery.  Ex. A at 27:1-4; 186:17-23.

Further, Plaintiff did not tell Kumar what type of leave she planned on taking, and acknowledged he could have interpreted her statement to mean she was planning on taking PTO or sick time. Ex. A at 27:5-8; 28:4-13; 83:16-21. Finally, she gave Kumar no indication about how long she would be taking off. *Id.* Therefore, Plaintiff did not invoke her rights to FMLA leave because she did not provide IKEA with adequate notice that she would be out on FMLA-qualifying leave.

> **2. Plaintiff cannot prevail on her FMLA retaliation claim because there is no causal link between her conversation with Kumar and her termination.**

Even if Plaintiff had invoked her right to FMLA leave (which she did not), her FMLA retaliation claim still fails because there is no causal link between her conversation with Kumar and her termination. In determining whether a plaintiff has established a causal link, a court analyzes two factors: 1) a showing that the two events were close in time; or 2) evidence of ongoing antagonism toward the employee. *Capps v. Mondelēz Glob, LLC*, 147 F.Supp.3d 327, 336 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017).

Here, Plaintiff acknowledged the conversation between her and Kumar, where she claims she invoked her right to FMLA leave, took place approximately two-and-a-half months before her termination. *See* Ex. A at 26:8-24. Courts in the Eastern District of Pennsylvania have "routinely granted summary judgment in cases where several weeks or months have elapsed between an employee's invocation of FMLA rights and the adverse employment action." *See Leathers v. GlaxoSmithKline, LLC*, No. 19-4939, 2021 WL 1837436, at *8 (E.D. Pa. May 7, 2021) (holding 34 days not unduly suggestive) (Gallagher, J.); *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2004) (finding a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that three weeks was insufficient to raise inference of causation).

Further, there is no evidence in the record of ongoing antagonism toward Plaintiff because of her need for hernia surgery.  At her deposition, Plaintiff shared that she has previously taken FMLA leave while employed at IKEA, specifically in 2010, 2012, and 2015.  Ex. A at 71:1-13. Plaintiff was, of course, not terminated during these periods and even received two promotions. She further admitted there is no evidence to suggest IKEA wanted to avoid accommodating her recovery from surgery.  *Id.* at 61:18-21.  Similarly, Plaintiff had no explanation for why Kumar would want to retaliate against her for taking any leave:

> Q.    Ms. Thompson, in your opinion back in the fall of 2019, could the store operate without you?
>
> A.    The store can operate without anyone.
>
> Q.    Okay.  That's what I thought.  So why would Mr. Kumar care if you were out on leave?
>
> A.    Again, clearly Sanjay knew he wanted to terminate me and he made whatever case he could to be able to terminate me as unjustifiable as it was.

*Id.* at 74:22-75:5.

To this same point, as previously stated, when Plaintiff told Kumar she was going to take some kind of leave, his response was simply "Okay" and that he did not seem upset.  *Id.* at 25:24-26:4.  Afterward, they continued their conversation, moving on to other topics.  *Id.* at 26:4-7.  The lack of temporal proximity between this conversation and her ultimate termination, coupled with the record being entirely devoid of any evidence of ongoing antagonism, necessitates summary judgment in this case.

### 3.  Plaintiff has no evidence to rebut the legitimate, non-retaliatory reasons IKEA had for terminating her.

If a plaintiff can establish a *prima facie* case for FMLA retaliation (which she cannot), the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action.  *See*

*Lichenstein*, 691 F.3d at 302 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If the employer meets this minimal burden, the plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably … disbelieve [the employer's] articulated reasons." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  Ultimately, Plaintiff must show that her requested FMLA leave was "a negative factor" in the employment actions taken by IKEA.  *Id.*  (citing 29 C.F.R. § 825.220(c)).

The reasons proffered by IKEA for terminating Plaintiff are consistent throughout the record.  Plaintiff was terminated because the commercial team was underperforming, and Kumar saw no progress in the development of the commercial team that would lead to long-term success.  Ex. G.  Moreover, feedback from co-workers and Kumar's own observations were that the departments within the commercial team were not functioning properly due to leadership deficits.  *Id.*  This resulted in the commercial team having low morale, high stress, and poor ways of working.  *Id.*  These reasons were succulently reiterated by Kumar during his deposition.  At the time of Plaintiff's termination, the store was **$500,000.00** behind its sales goal and had just received a failing score, 41 percent, on its business navigation review.  *See* Ex. G.  *See also* Ex. I.

Moreover, Plaintiff's leadership issues were documented and discussed with her in both her FY 18 and FY 19 Performance Reviews.  In her FY 2018 review, Briel stated that people were tired of walking on eggshells around Plaintiff and that she was a "bully" among other things.  Ex. C at IKEA 000722.  Following this Performance Review, Plaintiff herself asked for assistance from Briel with her leadership skills and even attended a leadership training.  Ex. D.  Moreover, in her FY 2019 Review, Plaintiff was told to not alienate people on her team and treat people in a professional, positive manner.  *Id.*  There is ample evidence in the record of the true reasons for Plaintiff's termination, none of which were her future FMLA leave.  Therefore, Plaintiff cannot

demonstrate her intent to use FMLA leave was a negative factor in the employment actions taken by IKEA, and IKEA is entitled to judgment as a matter of law.

Turning to pretext, Plaintiff's argument centers on two perceived issues: 1) the inclusion of the XPO settlement as a negative in her FY 19 Performance Review, and 2) Kumar's failure to discuss her performance issues with her prior to termination.  Related to the XPO settlement, Plaintiff stated during her deposition that Kumar included it in her Performance Review because he was looking for reasons to terminate her and this was "adding . . . fuel to that fire."  Ex. A at 47:18-21.  She added Kumar wanted to blame her for a problem that was under the purview of Katy Hoda, Area Operations Manager, who failed to report the problem to her.  *Id.* at 46:6-10; 47:3-8.

This argument is unavailing.  Plaintiff admitted during her deposition that Kumar said nothing about XPO during her termination meeting.  *Id.* at 47:22-24.  Further, throughout her deposition, Plaintiff acknowledged that Briel completed her FY 19 Performance Review.  *Id.* at 144:17-18.  Kumar agreed and testified, without hesitation, that Briel included the XPO settlement in Plaintiff's Performance Review.  Ex. B at 99:19-25, 105:20-23.  Indeed, Kumar was not even working at the IKEA College Park store during the XPO settlement.  Ex. A at 39:8-10.  Regardless, after Plaintiff requested that the reference be taken out, Kumar removed it without objection because he did not see it as an issue.  Ex. B at 106:1-14.

Relatedly, throughout her deposition, Plaintiff took issue with the fact Kumar never talked to her about her performance issues before terminating her.  To show pretext, however, Thompson "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.  Indeed, under the IKEA Corrective

16

Action Policy, no such conversation was required.  The Corrective Action Policy states "[w]hen IKEA believes a co-worker's performance is unacceptance or violates rules, the severity of any corrective action, up to including termination, falls within the Company's sole discretion."  Ex. F at IKEA 000498.  This is not a "progressive disciplinary policy" that required verbal and written warnings prior to termination.  *See* Ex. B at 41:1-18.  Instead, the Corrective Action Policy left considerable discretion up to the Store Manager when it came to the severity of any corrective action when a co-worker failed to meet expectations.  *See* Ex. A at 165:15-23.

Plaintiff also dodges the issue that Kumar explained his expectations to her in her most recent Performance Review.  Additionally, Kumar did not decide to terminate Plaintiff unilaterally. He stated he received approval from Market Area People & Culture Manager Laura Pena, IKEA College Park Unit People & Culture Manager Jonathan Padmore, and his supervisor Selwyn Crittendon (none of whom were aware of Thompson's comment to Kumar), and consulted with the IKEA legal team.  Ex. B at 33:21-34:21, 52:17-53:20.  Kumar followed all applicable IKEA guidelines in terminating Plaintiff, and there is no evidence of pretext.

In short, Kumar believed a change in leadership was necessary and that was his prerogative as Store Manager.  Therefore, there is no genuine dispute as to any material fact, and IKEA is entitled to judgment as a matter of law on Plaintiff's FMLA retaliation claim.

**B.  Plaintiff's ADEA and MFEPA Claims also Fail as a Matter of Law**

Moreover, Plaintiff cannot prevail on either her ADEA or MFEPA claims.  The ADEA prohibits employers from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The MFEPA also prohibits employers from discriminating against its employees because of age.  Md. Code Ann. State Gov't § 20-602

et seq.  District courts analyze these two claims together.  *See Perry v. Dillion's Bus Service, Inc.*, Civ. No. 16-3207, 2017 WL 2537011 at *7 (D. Md.. June 9, 2017) (analyzing a plaintiff's ADEA claim and MFEPA claim together); *see also MacKinnon v. Logitech Inc.*, No. 15-05231, 2017 WL 1354818, at *5 (N.D. Cali. April 13, 2017) (same).

Plaintiff admitted to having no direct evidence that her age was the reason for her termination.  *See* Ex. A at 50:1-3; 85:6-10.  Without direct evidence of age discrimination, a plaintiff can satisfy her burden by relying on circumstantial evidence under the familiar three-part burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Cellucci v. RBS Citizens, N.A.,* 987 F. Supp. 2d 578, 587 (E.D. Pa. Dec. 17, 2013).

### 1. The record is devoid of any circumstantial evidence that raises an inference of discrimination.

Applying the burden-shifting framework, to establish a *prima facie* case of age discrimination, Plaintiff must demonstrate: (1) she is within the protected age class; (2) she was discharged; (3) she was qualified for the position; and (4) the position remained opened or was filled by a similarly qualified applicant who was sufficiently younger to support an inference of discriminatory intent.  *Narin v. Lower Merion Twp. Sch. Dist.*, 206 F.3d 323, 331 (3d Cir. 2000).

Here, Plaintiff cannot establish circumstances that give rise to an inference of age discrimination.  During her deposition, Plaintiff conceded Kumar never made any comments about her age.  Ex. A at 61:12-14.  Moreover, Thompson conceded she would have to *speculate* to explain how an objective third party could believe she was terminated due to her age.  *Id.* at 85:12-18.  In other words, Thompson concedes her age discrimination claim does not pass muster.

Thompson attempts to create the illusion of age discrimination simply by pointing to her age as the reason for her termination and relying exclusively upon her admitted subjective belief that her age was the sole reason.  *Id.* at 64:18-21.  In *Connell v. Penn Auto Team*, a plaintiff brought

suit against his former employer, arguing he was terminated due to his age and gender. No. 19-3833, 2021 WL 2400717, at *1 (June 11, 2021) (Joyner, J.). In granting the employer's summary judgment motion, the court found the plaintiff largely relied on his subjective belief that he was treated unfairly due to his age and sex. *Id.* at *4. Specifically, during his deposition, the plaintiff stated that managers were "always cracking down on older employees." *Id.* "However, when pressed for any specifics, the plaintiff could not recall any examples of older people he felt were 'cracked down on.'" *Id.* at 4. *See also Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, No. 09-6110, 2011 WL 130156, at *8 (E.D. Pa. Jan. 13, 2011) (citing *Waggoner v. Garland*, 987 F.2d 1160, 1164 (5th Cir. 1993)) ("A plaintiff's personal belief that the real reason for the job action was discriminatory animus does not create a genuine issue of material fact.").

The same holds true here. During her deposition, Plaintiff stated, "I have had managers, store managers, previously at IKEA make comments as far as that person's too old; they can't work fast enough; they need to go." Ex. A at 49:6-12. However, when she was further asked if she was able to identify anyone who was terminated because of their age, she could not answer. *Id.* at 49:13-25. The two individuals she later "identified," she admitted were not in fact terminated at all. *Id.* at 50:14-51:3, 17-24. Therefore, Plaintiff's subjective belief that she was terminated because of her age is insufficient to create a dispute of material fact, and summary judgment must be granted.

### 2. Plaintiff Cannot Show the Legitimate and Non-Discriminatory Reasons Proffered by IKEA for Terminating her were Pretext for Age Discrimination.

If a plaintiff can establish a *prima facie* case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment action. If the employer satisfies this burden, the plaintiff must provide evidence that the stated reason is a mere pretext for age discrimination.

*Narin,* 206 F.3d at 331.  Indeed, a plaintiff must prove by a preponderance of the evidence "that age was the 'but-for' cause of employer's adverse decision."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  An "employer's reliance on factors that are analytically distinct from age in reaching the adverse decision rules out age as its but-for cause."  *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d. 697, 705 (D. Md. 2013).

As discussed in detail *supra*, the reasons IKEA had for terminating Plaintiff are well-documented and consistent throughout the record.  Plaintiff was terminated because the commercial team was underperforming, and Kumar saw no progress in the development of the commercial team that would lead to long term success. Ex. G.  This resulted in the commercial team having low morale, high stress, and poor ways of working.  *Id.*  Moreover, the College Park store was **$500,000.00** behind its sales goal and had just received a failing score, 41 percent, on its business navigation review.  *See* Ex. G; Ex. I.  Finally, Plaintiff's leadership issues were documented in her FY 18 and FY 19 Performance Reviews.  *See* Exs. D, G.  There is ample evidence in the record of the true reasons for Plaintiff's termination, none of which are her age. Therefore, Plaintiff cannot demonstrate age was the *but-for cause* of her termination, and IKEA is entitled to judgment as a matter of law.

Turning to pretext, Plaintiff's argument centers on two perceived issues: 1) the inclusion of the XPO settlement as a negative in her FY 19 Performance Review, and 2) Kumar's failure to discuss her performance issues with her prior to termination.  Both arguments are unpersuasive. Plaintiff admitted during her deposition that Kumar said nothing about XPO during her termination meeting. Ex. A at 47:22-24.  Further, throughout her deposition, Plaintiff acknowledged that Briel completed her FY 19 Performance Review.  *Id.* at 144:17-18.  Kumar agreed. Ex. B at 99:19-25. Additionally, the IKEA Corrective Action Policy does not require pre-termination conversations

and Kumar had previously discussed Plaintiff's leadership issues with her during her performance review.  *See* Ex. D, F.  To show pretext, Plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.  Here, Plaintiff argues Kumar may have been mistaken in terminating her or that the decision to terminate her employment without holding additional performance discussions first was not wise.  That is insufficient as a matter of law.  Thus, there is no genuine dispute as to any material fact, and IKEA is entitled to judgment as a matter of law on all of Plaintiff's claims.

## V.      CONCLUSION

For all the foregoing reasons, Defendant respectfully requests the Court grant summary judgment in its favor and dismiss Plaintiff's Complaint in its entirety with prejudice.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

*/s/ Brandon R. Sher*
Brandon R. Sher
1735 Market Street
Suite 3000
Philadelphia, PA 19103
Telephone:  215-995-2840
Fax:  215-995-2801
brandon.sher@ogletree.com

Attorneys for Defendant
IKEA US RETAIL LLC