IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| | : | |
| LORI THOMPSON | : | DOCKET NO. 21-5288 |
| | : | |
| v. | : | |
| | : | The Honorable Joel H. Slomsky |
| IKEA US RETAIL, INC. | : | |
| | : | |

## PLAINTIFF'S COUNTERSTATEMENT OF UNDISPUTED FACTS

**I.**    **Lori Thompson has a twelve-year distinguished career with IKEA.**

1. – 6.  These paragraphs of Defendant's Statement of Undisputed Facts are hereby adopted by Plaintiff.

7.    This paragraph of Defendant's Statement of Undisputed Facts is mis-stated by Defendant. As Commercial Manager, Plaintiff oversaw all commercial aspects of the store, including preparation and flow, sales plan and steer (not "sales plan, steering"), merchandising basics, communication, interior design, and product quality.

8. – 15.  These paragraphs of Defendant's Statement of Undisputed Facts are hereby adopted by Plaintiff.

16. – 22.  These paragraphs of Defendant's Statement of Undisputed Facts are unequivocally disputed. Defendant cherry-picks various quotes from its Exhibit C. For instance, Briel's "Welcome Message" in Plaintiff's annual review reads *in its entirety* as follows:

> I promoted Lori to commercial manager because I thought she could get things done while maintaining the logistics operation. She might become a strong commercial manager if she accepts that she needs to change to be successful.. The number one thing is for her too [sic] learn to admit your weaknesses, including being too competitive and ask for help when needed. Her peers have given up on this happening. In a recent meeting I challenged her on a point and she asked me for an example. When I gave her the example she denied it, while her peers in the room sat in amazement. Admit your mistakes, Admit when you don't know something, talk about your weakness. During Lori's interviews for DSM it was pointed out that she only talks about her accomplishments and her strengths, she

cannot admit her mistakes.  unitl [sic] this happens she will always have a
contentious relationship with her boss and her peers. People are tired of walking
on eggshells around her. There is NO reason that with her background her concept
knowledge should be strong, but she doesn't ask for help or believe me when I tell
her about the concept. With her managers she believes in loyalty first and
knowledge second. Understand that some of the people close to you are using this
to manipulate your decisions.

Lori is clearly two people - one , open and honest and a champion for
D&I. The other is a bully - never wrong, willing to defend herself and her
mistakes with all of her energy. This keeps her peers and subordinates off balance
and away from her.

(Exhibit C, p. IKEA 000722).

In addition, with respect to the "Assignments" section of the Annual Review, Briel found

that Plaintiff "Meets Expectations" in ten categories, "Partly Meets Expectations" in two

categories, and "Exceeds Expectations" in one category.  (Exhibit C, p. IKEA 000722-23).

In the "Leadership capabilities" section of the review, Briel wrote, "Lori has an intense

focus on what's good for the business.  Her operational skills are very strong and she can get

things done."  (Exhibit C, p. IKEA 000725).

23.-25.  These paragraphs of Defendant's Statement of Undisputed Facts are hereby

adopted by Plaintiff.

26.      Plaintiff actually participated in "My Conscious Leadership" program in 2013-

2014, but the distinction is not material, therefore Plaintiff adopts this paragraph of Defendant's

Statement of Undisputed Facts.

## II.     Plaintiff saves Defendant $118,000 in a matter which its own legal team had abandoned.

27. – 29.  These paragraphs of Defendant's Statement of Undisputed Facts are

unequivocally disputed.  Plaintiff did, in fact, learn that XPO Logistics ("XPO") had been

overbilling IKEA for an extended period of time. Independently, she investigated the matter,

reported it to IKEA corporate counsel, which chose to take no action on the matter, and yet she

was able to personally and single-handedly negotiate a settlement which resulted in a repayment

to IKEA from XPO in the amount of $118,000. (Deposition of Lori Thompson, Exhibit A at

40:21-41:4; Plaintiff's Complaint, Exhibit H, ¶21[1]; Statement of Dwight Sweatt, Exhibit I[2], ¶7;

Statement of Frank Briel, Exhibit J, ¶¶3-6; Statement of Lucinda Branson, Exhibit K, ¶8).

Despite IKEA's legal team reluctance to pursue XPO for the overpayment, this

spectacular result had a significant effect on the store's bottom line, and Lori received special

recognition for it during the College Park Manager's Meeting, in "What's Up College Park," and

at the All Store Meeting. (Ex. A, at 41:22, 233:18-19; Exhibit J, ¶¶5, 6, 8).

**III.**    **Kumar becomes College Park Store Manager and is barely seen there until January of 2020.**

30.-33. These paragraphs of Defendant's Statement of Undisputed Facts are hereby

adopted by Plaintiff.

34.    This paragraph of Defendant's Statement of Undisputed Facts is unequivocally

disputed. While Briel had completed Plaintiff's FY 2019 Performance Review, Kumar did not

use Briel's draft. Briel unequivocally denies writing the review submitted to Plaintiff and

attached to Defendant's Motion for Summary Judgment as Exhibit D. Kumar modified,

manipulated and changed what Briel submitted before initially presenting it to Plaintiff. (Ex. J,

¶¶9, 13).

35.-36. These paragraphs of Defendant's Statement of Undisputed Facts are

unequivocally disputed. Kumar, himself rewrote Plaintiff's review, and inserted a critical

---

[1]        As discussed in more detail in Plaintiff's Brief, *Defendant* has attached Plaintiff's Civil Action Complaint to its Motion for Summary Judgment, which Complaint includes statements under oath, thereby rendering the Complaint part of the record before this Honorable Court on Summary Judgment.

[2]        In opposing Defendant's Motion, Plaintiff refers to the record relied upon by Defendant (Exhibits A through H) as well as Plaintiff's additional exhibits I through P filed contemporaneously with Plaintiff's response to that Motion.

reference to the XPO Settlement, suggesting that Plaintiff was actually at *fault* for recovering $118,000 for the store.  (Ex. "A" at 40:21-41-4; Ex. J, ¶¶14).

37.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed. Plaintiff objected to what she knew was Kumar's modified version of Briel's Performance Evaluation and refused to sign it unless the reference to XPO was removed.  (Ex. A at 41:5-9). Kumar was barely at the College Park store until January of 2020, because he was busy relocating his family and purchasing a house. Kumar never had the opportunity to evaluate Plaintiff's performance.  (Ex. A at 248:3-5, Ex. I at ¶5, Ex. K at ¶¶4-5.)

38.     This paragraph of Defendant's Statement of Undisputed Facts is hereby adopted by Plaintiff.

39.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed.  Exhibit D plainly shows that in every "Leadership capabilities" section of the review Kumar signed Plaintiff was rated as "Meets Expectations."  (Ex. D, pp. IKEA 000744-745.)

40.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed.  Defendant again cherry-picks various quotes from its Exhibit D.  The "Leadership capabilities" section of the review reads verbatim *in toto* as follows:

**Develop the business & deliver results**                                                      Meets Expectations
*Comment*          *Take a more positive approach to the day to day business and projects that need to be completed stop
blaming past organizational changes and budget constraints.*

**Lead and develop people**                                                      Meets Expectations
*Comment*          *It's time to manage out the part of the organization that did not adapt and grow in the new
organization.  Build a bench in all of your areas*

**Inspire and clarify**                                                      Meets Expectations
*Comment*          *Know your audience and treat others in a collaborative and professional way.*

**Create togetherness**                                                      Meets Expectations
*Comment*          *Treat others in a professional way. You are a senior leader, you need to bring everyone together, not
alienate members of your own team.*

**Find better ways**                                                      Meets Expectations
*Comment*          *Why are salaried managers working overnights and not TL's and coworkers- especially you !!*

**Enable change**                                                      Meets Expectations
*Comment*

**IKEA Values**                                                      Meets Expectations
*Comment*          *You care greatly about IKEA and the IKEA Values. Focus on Caring for people and planet.*

(*Id.*)

41.-42.   These paragraphs of Defendant's Statement of Undisputed Facts are

unequivocally disputed.  Defendant quotes from only a portion of "Assignments" section of

Exhibit D.  That section has thirteen criteria, for eleven of which Plaintiff was rated "Meets

Expectations."  That section reads verbatim *in toto* as follows:

| | |
|---|---|
| Leads the Prep & Flow Leader, Sales Steering and Support and Com&In leads and teams. | **Meets Expectations** |
| Collaborates with the Prep and Flow Leader to ensure the 7 steps of the logistics process are secured. | **Meets Expectations** |
| Establishes and maintains service agreements with internal stakeholders and external partners in order to protect operational standards and help safeguard the IKEA culture and brand. | **Meets Expectations** |
| Ensures vitality and seasonality in the store together with the store team. | **Meets Expectations** |
| Optimizes sales and profitability in the store using the knowledge of the range, local market, competition and customers in any channel. | **Partly Meets Expectations** |
| Partners with the store manager to stimulate and increase interest in home furnishing for all co-workers in the store. | **Meets Expectations** |
| Delivers and leads the multi-channel commercial action plan for the store, takes input from team and the matrix managers to support the department to achieve the agreed goals for the country, maximizes sales, and generates sustained long- and short-t | **Meets Expectations** |
| Enables the IKEA mechanical sales system to work efficiently and ensures the continued success of the IKEA Concept. | **Partly Meets Expectations** |
| Analyzes the store's performance and uses this information to identify good solutions and ideas for improving the IKEA mechanical sales system and easy buying process. | **Meets Expectations** |
| Ensures leaders understand the multi-channel retail environment they are working in and know how to use this in the best and most commercial way for different customers. | **Meets Expectations** |
| Contributes with knowledge of people's life at home, of your local market potential, and consumer shopping behavior and shares with the field advisors and Store Manager to contribute in creation and implementation in the store business plan. | **Meets Expectations** |
| Works with the field and central teams to guarantee IKEA brand and distance IKEA retailers from the competition, initiates and facilitates all the process of the working method for presenting the IKEA range that leads the store team to a relevant, su | **Meets Expectations** |
| Gathers and translates insights from home visit interviews into locally relevant, functional, aesthetic and commercial home furnishing solutions that exceed customer expectations and reflect home furnishing the IKEA way. | **Meets Expectations** |

Moreover, Briel believed Plaintiff's performance and leadership skills had improved at

the time he prepared his draft of her FY2019 review, the draft Kumar chose not to use.  (Ex. J,

¶15).

43.-46.   These paragraphs of Defendant's Statement of Undisputed Facts are unequivocally disputed.  In giving Plaintiff a Total score" of "Meets Expectations" on her review, he added cryptic language like "Focus away from metrics.  Rather than specific metrics, use measures that are easier for the team to achieve," and "How the culture used to be is exactly that.  You are an agent of change.  Shape the culture you want."  (Ex. D, p. IKEA000748).   Briel even noted errors in what Kumar ultimately prepared. (Ex. J, ¶13).

47.-54.    These paragraphs of Defendant's Statement of Undisputed Facts are hereby adopted by Plaintiff, however, see Plaintiff's Supplemental Statement of Undisputed Facts below, at ¶¶97-100 reflecting that such inspections could be "staged" and manipulated.

**IV.    Plaintiff tells Kumar about her impending need for FMLA leave.**

55.    This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed.  Plaintiff told Kumar about her need to take time off for surgery not earlier than September 11, 2019, the date she was examined by her surgeon (Ex. L, ALONGI 00006), and not later than September 25, 2022 (Ex. A at 24:22-27:7, Ex. M, IKEA 000668).

56.    This paragraph of Defendant's Statement of Undisputed Facts is hereby adopted by Plaintiff.

57.    This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed.  Plaintiff told Kumar the reason she intended on scheduling the surgery for early the following year.

> I mentioned this fact to my store manager and direct supervisor, Sanjay Kumar, and that it was my intention to not schedule the surgery until February or March of 2020 which were typically slower periods in the store.

(Ex. A at 24:17-21).

58.    This is not a material fact.  As discussed in detail in Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, Plaintiff is not required to use "magic words" to invoke the Family and Medical Leave Act.  She does not even need to use the words "Family

and Medical Leave Act. The critical question is how Kumar interpreted the information she

conveyed. *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007).

59.-61.    These paragraphs of Defendant's Statement of Undisputed Facts are adopted by

Plaintiff.

62.-63.    These paragraphs of Defendant's Statement of Undisputed Facts are not facts;

they are argument.  As discussed in detail in Plaintiff's Brief in Opposition to Defendant's

Motion for Summary Judgment, it does not matter what IKEA's policy states, Plaintiff is not

required to use "magic words" to invoke the Family and Medical Leave Act, nor does she have

to place anything in writing as a prerequisite to being protected under that Act. *Sarnowski v. Air*

*Brooke Limousine, Inc.*, *supra.*

64.    This is not a material fact.  What Kumar was "aware" of is not material to

Plaintiff's claims. What he *should* have done with the information Plaintiff gave him *is* material.

**V.      Kumar terminates Plaintiff in violation of IKEA policy and the FMLA.**

65.    This paragraph of Defendant's Statement of Undisputed Facts is unequivocally

disputed.  Plaintiff was terminated on December 3, 2019, not more than 83 days and not less than

70 days after telling Kumar about need for leave. Kumar's decision was made weeks prior to

that, and by not later than November 21, 2019 he started drafting the Corrective Action to

terminate Plaintiff.  (See ¶¶90-102, infra; Ex. O).

66.    This paragraph of Defendant's Statement of Undisputed Facts is unequivocally

disputed.  Moreover, Defendant may not claim that anyone other than Kumar was a decision

maker or was otherwise involved in the process of firing Plaintiff.  Plaintiff's Interrogatory to

Defendant Number 5, and Defendant's response reads as follows:

INTERROGATORY:

    5. Identify all employees and/or contractors of IKEA who:
        a. Made the final decision to terminate Ms. Thompson's employment;
        b. Were involved in reaching the decision to terminate Ms. Thompson's employment;
        c. Provided information relied upon the decision maker in reaching the decision to terminate Ms. Thompson's employment;
        d. Were involved in any investigation of Ms. Thompson's conduct and/or performance antecedent to the decision to termination her employment;
        e. Were present in the room when Ms. Thompson was terminated.

ANSWER: Defendant objects to this interrogatory because it is vague and ambiguous, particularly with respect to the phrase "involved in reaching the decision." Defendant also objects to this interrogatory because it is overbroad, unduly burdensome, disproportionate to the needs of the case, and oppressive in that literal compliance with it would require Defendant to conduct an unreasonable investigation on Plaintiff's behalf to ascertain the facts sought. Defendant further objects to this interrogatory to the extent it seeks information protected by the attorney-client privilege and/or the work-product doctrine Subject to and without waiving these objections or the General Objections above, **Sanjay Kumar made the final decision to terminate Plaintiff's employment.** By way of further response, Defendant refers Plaintiff to Plaintiff's December 3, 2019 Corrective Action.

(Ex. N-1, hereto; emphasis added). Kumar signed the affirmation to IKEA's Answers.

Plaintiff's counsel's deficiency letter to IKEA's counsel regarding this answer reads in

pertinent part:

    Finally, defendant objects to interrogatory no. 5, which is similar to interrogatory no. 1, except that it asks the identity of all of those individuals who were in any way involved in the decision to terminate the plaintiff. Plaintiff believes that her termination was pretextual, if not flatly discriminatory. Doubtless, this will also be the subject of a motion for summary judgment, and it is entirely possible that plaintiff may recover under the "cats paw" theory. As such, it is entirely appropriate for this information to be requested from IKEA, and it is inexplicable that IKEA might not know or have at its fingertips a response to this interrogatory.

(Ex. N-2, hereto; emphasis added).

IKEA's counsel wrote back in response:

**Decision Maker**

In its Answer to Interrogatory No. 5, IKEA confirmed that Sanjay Kumar made the decision to terminate Plaintiff's employment. There can be no "cats paw" theory as Mr. Kumar was Plaintiff's direct manager, and he stated the reasons for Plaintiff's termination in the December 3 Corrective Action, Bates numbered IKEA 00084-86. Mr. Kumar's deposition is scheduled for August 24, 2022.

(Ex. N-3, hereto; emphasis added).

Defendant is precluded from arguing that Kumar acted other than alone in firing Plaintiff. At best, any claim or testimony that he relied upon anyone else, conferred with anyone else, or secured the agreement of anyone else contradicts his own sworn affirmation to the Answers to Interrogatories, thereby creating a genuine issue of material fact.

Besides, even as Kumar was creating the Corrective Action in November of 2019, he was also communicating regularly with Plaintiff via Microsoft Teams chat and telling her things like "Awesome really nice job LT!" (Ex. P, P0214); "once I'm back I'll be able to support in whatever way I can better...." (*Id.*); and "Let me know how I can support you and Brandon" (Ex. O; Ex. P, P0219).

At the same time, Kumar conceded that he and Plaintiff never once "met in a structured way." (Ex. B at 113:7). Exhibit G is just a "CMA" memo which proves Kumar's pretext.

67.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed. As outlined in the prior paragraph, Exhibit G is proof of pretext for the real reason Kumar terminated Plaintiff.

68.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed. What Kumar "determined" was that he wanted to terminate Plaintiff, and he made sure that he made it possible to do so. See above ¶66 and *infra* ¶¶84-104. As discussed more fully in Plaintiff's Brief, what Kumar *should* have done at the very least was encourage Plaintiff to begin the formal process of securing FMLA leave in accordance with IKEA's policies.

69.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed. While it is admitted that Kumar *believed* there was "no progress in development of the commercial team," it is unequivocally denied that such was the case. Kumar's claimed perception was pretext for his discriminatory intent in terminating Plaintiff's employment. (Ex. A at 67:3-8; 68:4-16; Ex. I at ¶13; Ex. K at ¶11).

70.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed. While Kumar may have testified as such, it is unequivocally denied that he had the opportunity to make such observations. Kumar was not regularly in the College Park, MD store until January of 2020, by which point he had already fired Plaintiff. (Ex. A at 248:3-5; Ex. I at ¶5; Ex. K at ¶¶4-5).

71.     It is admitted that the corrective action reads *in part* thusly, but that document is pretext for Kumar's discriminatory intent in terminating Plaintiff's employment.  (See *infra* at ¶¶90-95).

72.-73.    These paragraphs of Defendant's Statement of Undisputed Facts are unequivocally disputed. Kumar testified that the "year" began on September first of each year. Based upon his manipulation of Plaintiff's annual review, it is likely that he had decided to fire Thompson by October. Kumar spent October and November documenting his pretext so as to be able to fire Plaintiff upon his return from Copenhagen on December 3, 2019. It would have been impossible to determine whether sales were going to meet annual at that point in time. (See *infra* at ¶¶84-103).

74.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally disputed. While Kumar said these words under oath, it is unequivocally denied that he would have had the opportunity to make such observations until after he had already fired Plaintiff. (Ex. A at 248:3-5; Ex. I at ¶5; Ex. K at ¶¶4-5).

75.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally

disputed.  As set forth above in ¶66, Defendant's Answer to Plaintiff's Interrogatory 5 identifies

Kumar as the decision maker without identifying any information or individuals upon which

Kumar relied. IKEA cannot now claim that any other source other than Kumar's own

observations were the basis of the termination, and Kumar simply was not around the College

Park Store enough to make any of the observations he says he made.  (Ex. A at 248:3-5; Ex. B at

113:2-7; Ex. I at ¶5; Ex. K at ¶¶4-5; Ex. N-1 and N-3).

76.     This paragraph of Defendant's Statement of Proposed Undisputed Facts is

adopted by Plaintiff.

77.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally

disputed. While the language Defendant quotes exists in the Corrective Action Policy, that policy

also states:

> The corrective action process is intended to give co-workers
> notice, when IKEA deems appropriate, of problems with their
> conduct or performance in order to provide them an opportunity to
> improve. The Corrective Action form is used to document the
> unsatisfactory performance and/or violation of rules, with stated
> expectations and consequences for non-improvement.

(Ex. F, pages IKEA 000497-498). So while that policy states that Kumar *could* have terminated

Plaintiff, it does not suggest that he *should* have done so.

78.     This paragraph of Defendant's Statement of Proposed Undisputed Facts is

adopted by Plaintiff.

79.     This paragraph of Defendant's Statement of Undisputed Facts is unequivocally

disputed. Kumar's interpretation and IKEA's selective quotation from the Corrective Action

Policy is convenient. The Policy specifically states:

> When IKEA believes a co-worker's performance is unacceptable or violates rules,
> the severity of any corrective action, up to including termination, falls within the
> ***Company's*** sole discretion.

(Ex. F, pages IKEA 000498, Emphasis added). The foregoing makes it clear that not just Kumar could make that determination, as he did in this instance, constituting further evidence of pretext.

80.     This is not a material fact; it is a convenient "interpretation" and argument by counsel. Plaintiff unequivocally disputes that Kumar was following any IKEA policy when he unilaterally fired Plaintiff after more than twelve years of the job upon learning that she intended to take FMLA leave.

81.     This is not a material fact; it is argument by counsel. The *fact* is that Plaintiff's performance review in all categories *improved* from 2018 to 2019.  (Ex. C and D; Ex. J at ¶15).

82.-83.   These paragraphs of Defendant's Statement of Proposed Undisputed Facts are adopted by Plaintiff.

**PLAINTIFF'S ADDITIONAL PROPOSED STATEMENT OF UNDISPUTED FACTS**

VI.    **Plaintiff informs Kumar about her need for FMLA leave and Kumar immediately decides to fire her.**

84.     Plaintiff saw her physician on September 11, 2019 at which point she was told that she would require surgery.  (Ex. A at 23:9-22; Ex. L).

85.     Her physician told her that the surgery would require her to miss a few weeks of work.  (*Id.*)

86.     While Kumar was barely around the College Park store even after becoming its Store Manager, Plaintiff did manage to inform him of her need to take leave, and that she would take such leave in January or February when sales were slowest.  (Ex. A at 24:17-21; Ex. B at 67:12-25).

87.     Kumar remembers that such a conversation occurred.  (Ex. B at 67:12-25).

88.     Within not more than two weeks of this conversation, an email thread among Kumar's superiors indicates that Kumar had miraculously found the "root of leadership issues" at the College Park store.  (Ex. M, IKEA 000668).

89.     It would have been impossible for Kumar to have solved any problems at the store in such a brief period as he was not even present in the store during that time.  In fact, Kumar was not routinely in the College Park, MD store until January of 2020. (Ex. A at 248:3-5; Ex. I at ¶5; Ex. K at ¶¶4-5).

90.     Shortly thereafter, Kumar manipulated Plaintiff's annual review process by blaming her for an incident in which IKEA was overcharged by XPO.  (Ex. A at 40:21-41:9; Ex. J at ¶¶11-16).

91.     Plaintiff's original annual review had been prepared by the prior Store Manager, Frank Briel, who had publicly praised Plaintiff in connection with the XPO overcharge. Kumar did not use Briel's draft.  (Ex. B at 103:9-12; Ex. J at ¶¶11, 14).

92.     The XPO overcharge was discovered by Plaintiff; was brought to the attention of IKEA's legal department, which refused to take any action, leaving Plaintiff to take the initiative to secure the $118,000 refund to IKEA.  (Ex. A at 41:18-42:6; Ex. J at ¶¶4-5).

93.     The $118,000 recovery had a significant positive impact on the College Park Store's bottom line.  (Ex. A at 233:9:19; Ex. J at ¶6).

94.     Plaintiff went above and beyond what was required of her in securing this significant recovery for Defendant.  (Ex. A at 233:9:19; Ex. J at ¶8).

95.     Kumar included language critical of Plaintiff in connection with the XPO matter, which Plaintiff refused to sign, so Kumar agreed to remove that criticism. In all other respects, the review showed improvement year over year. (Ex. A at 40:16-42:21; Ex. B at 102:7-10; Ex. D).

96.     Finding that he could not manipulate Plaintiff's review process to justify terminating her, he sought to manipulate a business navigation commercial review. (Ex. I at ¶¶12-14; Ex. J at ¶¶17-18, Ex. K at ¶¶9-11).

97.     The review was supposed to be of bedrooms at the College Park store, even though a decision had already been made to remodel all the bedrooms at the store. (Ex. I at ¶13).

98.     During a business navigation commercial review, the commercial team, which was managed by Plaintiff, ordinarily prepares and shows a display room to Defendant's senior sales team, but the store manager can effectuate a change in what is reviewed. (Ex. I at ¶¶8-11; Ex. J at ¶¶17, Ex. K at ¶9).

99.     Kumar got the reviewing team to interrupt Plaintiff's presentation and switch to a room in a neglected area of the store for which a remodel and fixture replacement was already planned so he could make Plaintiff look bad. (Ex. I at ¶14; Ex. K at ¶11).

100.    The report of that review in fact did criticize things at the store for which Plaintiff's commercial team was not responsible. (Ex. I at ¶13).

101.    The store scored only 41% on the review, which was a failing grade. (Defendant's Statement of Undisputed Facts at ¶52).

102.    Thusly buttressed with a poor business navigation commercial review which he could blame on Plaintiff, Kumar started preparing a Corrective Action document by which he would terminate Plaintiff's employment. (Ex. B at 47:8-10; Ex. O, IKEA 000941-943).

103.    Nobody with whom Kumar allegedly "consulted" on the corrective action terminating Plaintiff prevented Kumar from going ahead and firing Plaintiff. (*Id.*).

104.    Kumar admits that he was the sole individual who decided to terminate Plaintiff. (Ex. N-1 and N-3).

105.    Kumar himself moved on to a store in Bloomington, MN only two years after

coming to College Park. (Ex. B at 12:15-18). This at least suggests that *he* was the "leadership

issue" at College Park, not Plaintiff.

HAROLD M. GOLDNER, ESQ.
Pennsylvania Attorney I.D. 32367
FRIEDMAN SCHUMAN
275 Commerce Drive, Suite 210
Fort Washington, PA  19034
(215) 690-3818
Fax (215) 635-7212
hgoldner@fsalaw.com

Attorney for Plaintiff

Date: January 4, 2023