IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LORI THOMPSON,                          )
                                        )    No. 21-05288
                   Plaintiff,           )
                                        )    The Honorable Joel H. Slomsky
          v.                            )
                                        )
IKEA US RETAIL LLC,                     )
                                        )
                   Defendant.           )

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiff acknowledges the deficiency of her age discrimination and state law claims in her Brief in Opposition to Defendant's Motion for Summary Judgment ("Opposition Brief"). (Doc. No. 26-2 at p. 5 n.1.) Consequently, she agreed the Court should dismiss Counts II and III of her Complaint. (*Id.*) Plaintiff's FMLA claims (Count I of the Complaint) are similarly flawed and must be dismissed as a matter of law.

In her Opposition Brief, Plaintiff attempts to salvage her Complaint by manufacturing a false narrative and ignoring Third Circuit precedent. Indeed, Plaintiff never establishes she provided IKEA with adequate notice of her intention to take FMLA leave. Rather, she dodges the issue and continues to rely on her subjective, unsubstantiated belief that the new Store Manager of IKEA College Park, Sanjay Kumar, "initiated [a] campaign to discredit [her] and ensure that she would no longer be an IKEA employee before she could take that leave under the [FMLA]." (*Id.* at 8.)

Likewise, she attempts to establish causation between her purported invoking of rights under the FMLA and Kumar beginning his supposed "campaign" to terminate her. Plaintiff's

opposition, however, is notably silent as to how there is any temporal proximity between her mid-September 2019 conversation with Kumar where she notified him of her intention to have surgery and her ultimate termination on December 3, 2019, over two-and-a-half months later. *See* Ex. A[1] at 26:8-24.

Plaintiff cannot establish a *prima facie* case of FMLA retaliation, so she devotes the majority of the Opposition Brief on alleged pretext. In keeping with her distorted version of events, Plaintiff offers purported facts that are no more than distractions to the simple fact Plaintiff was terminated because Kumar determined her leadership deficiencies led to the commercial team underperforming. Ex. G. Attached to her Opposition Brief are declarations from three former IKEA co-workers: Dwight Sweatt, Frank Briel, and LuCinda Branson.[2] Ex. I, J, and K. These declarations are offered as evidence to support three separate arguments that Plaintiff claims show pretext.

First, that Briel did not write Plaintiff's 2018/2019 Performance Review[3]. Second, that Sanjay Kumar was rarely at the IKEA College Park store and therefore could not have observed

---

[1] The exhibits refer to the exhibits attached to Defendant's Motion for Summary Judgment and Plaintiff's Opposition.

[2] LuCinda Branson is a party in multiple lawsuits against IKEA.

[3] It is of no consequence, but Briel is mistaken by claiming he did not write Exhibit D. For instance, in the Start Up Talk (Doc. 23-8, p. 14 of 19), which mentions a "Jim" (p. 15), it reveals Briel signed it on December 13, 2018. Moreover, Thompson herself testified, "I know that Frank had completed our performance reviews and that he gave notes to Sanjay regarding our performance reviews, not to be added to the performance reviews." (Ex. A. at 37:24-38:3). Thompson explained "the performance review was for our previous year's performance. Sanjay Kumar was not part of that conversation . . . Frank completed those reviews." *Id.* at 38:4-9.

Plaintiff's leadership deficiencies.[4]  And third, that Kumar purposely changed the area of the store reviewed during the Business Navigation Commercial Review to make Plaintiff look bad and provide another justification for her termination.  Other than these conclusory and self-serving declarations of individuals who had nothing to do with Plaintiff's termination, which are insufficient to survive summary judgment, Plaintiff presents no other evidence to discredit Defendant's legitimate, non-retaliatory reasons for her termination.

## II.  ARGUMENT

### A. Plaintiff fails to present evidence that Defendant had adequate notice of her intention of taking FMLA Leave.

In her Opposition Brief, Plaintiff agrees with Defendant that the "critical test" in determining whether an employee provided adequate notice of his or her intention of taking FMLA leave "is not whether the employee gave every necessary detail to determine if the FMLA applies, **but how the information conveyed to the employer is reasonably interpreted**." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007) (emphasis added).  Despite agreeing with this notion, Plaintiff provides no evidence and presents no argument as to how Kumar reasonably interpreted Plaintiff's comments about her intent to have surgery in the future (at least five months later).

As discussed in Defendant's Brief in Support of its Motion for Summary Judgment, Plaintiff only indicated to Kumar that she needed surgery and was planning on scheduling it for February or March 2020 when the store was slow.  *See* Ex. A at 24:17-20; 25:5-11.  Plaintiff did

---

[4]  Paragraph 86 of Plaintiff's Additional Proposed Statement of Undisputed Facts states that "Kumar was barely around the College Park store even after becoming its Store Manager" and cites to portions of both Plaintiff and Kumar's depositions.  Neither of these citations stand for the proposition that Kumar was barely at the IKEA College Park store.

not tell Kumar how long she intended to be out for her surgery or the duration of any possible recovery time. *Id*. at 27:5-8. Plaintiff acknowledged during her deposition that Kumar could have interpreted her statements to mean she was taking paid time off (PTO) for her surgery. At her deposition, Plaintiff even admitted Kumar would not know what type of leave she would be taking "until the surgery happened", and he would not know how many days she would be out. *Id*. at 27:17-24, 28:4-29:2. Therefore, IKEA is entitled to summary judgment on Plaintiff's FMLA claims.[5]

> **B. Plaintiff cannot establish any temporal proximity between her adverse action and the "invocation" of her FMLA rights.**

Moreover, there is no temporal proximity between Plaintiff and Kumar's conversation in September 2019 and Defendant's termination of her employment. Plaintiff agrees with IKEA that there is no "bright line rule" as to what constitutes unduly suggestive timing between the protected activity and the adverse employment action.[6] (Doc. No. 26-2 at 8 quoting *Lichtenstein v. UPMC*, 691 F.3d at 307-08.)

Beyond this, Plaintiff seems to have a misunderstanding as to what events are relevant when evaluating temporal proximity. Plaintiff argues there were less than two weeks between her

---

[5] In her Opposition Brief, Plaintiff emphasizes that for her FMLA interference claim, she does not need to show Defendant had a discriminatory motive. While this is accurate, in order to prove an FMLA interference claim, a plaintiff must still give notice to the employer of his or her intention to take FMLA leave. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017). Moreover, Plaintiff cannot establish that IKEA actually withheld FMLA benefits from her, another element of an interference claim, because Plaintiff never applied for and was never subsequently denied FMLA leave. *See id*. at 156. Nevertheless, FMLA interference claims predicated upon an employee's termination are construed as retaliation claims. *See Stephenson v. JLG Indus.*, No. 09-1643, 2011 WL 1304625, at *5 (M.D. Pa. Mar. 31, 2011).

[6] Plaintiff does not contend there is evidence of ongoing antagonism toward her because of her need for hernia surgery.

and Kumar's conversation about her surgery and when Kumar began his supposed campaign to terminate her. (Doc. No. 26-2 at 8.) However, "[t]he relevant dates for assessing temporal proximity are those on which the employee invoked their rights under the FMLA and the date of the adverse action." *Leathers v. GlaxoSmithKline, LLC*, No. 19-4939, 2021 WL 1877436, at *8 (E.D. Pa. May 7, 2021) (citing *Budhun v. Reading Hosp. and Medical Center*, 765 F.3d 245, 256 (3d Cir. 2014)). Thus, by Plaintiff's own admission, about two-and-a-half months passed between the purported "invocation" of her FMLA rights and her ultimate termination. *See* Ex. A at 26:8-24. As stated in Defendant's Brief in Support of its Motion for Summary Judgment, courts in the Eastern District of Pennsylvania "routinely granted summary judgment in cases where several weeks or months have elapsed between an employee's invocation of FMLA rights and the adverse employment action." *See Leathers*, 2021 WL 1877436 at *8.[7]

Finally, Plaintiff again offers no explanation for why Kumar would want to retaliate against her for taking any leave:

> Q: Ms. Thompson, in your opinion back in the fall of 2019, could the store operate without you?
>
> A: The store can operate without anyone.
>
> Q: Okay. That's what I thought. So why would Mr. Kumar care if you were out on leave?
>
> A: Again, clearly Sanjay knew he wanted to terminate me and he made whatever case he could to be able to terminate me as unjustifiable as it was.

---

[7] Other examples cited in Defendant's Brief in Support of its Motion for Summary Judgment: *Blakney v. City of Philadelphia*, 559 F. App'x 183, 186 (3d Cir. 2004) (finding a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that three weeks was insufficient to raise an inference of causation).

Ex. A. at 74:22-75:5.   The lack of temporal proximity, combined with an utter lack of reason as to why Kumar would want to retaliate against Plaintiff in the first place, necessitates summary judgment in this case.

### C. Plaintiff has no evidence to rebut the legitimate, non-retaliatory reasons IKEA had for terminating her employment.

The reasons proffered by IKEA for terminating Plaintiff are consistent throughout the record, and Plaintiff has not produced evidence to discredit these reasons. Plaintiff was terminated because the commercial team was underperforming, and Kumar saw no progress in the development of the commercial team that would lead to long-term success.[8] Ex. G.  Moreover, feedback from co-workers and Kumar's own observations were that the departments within the commercial team were not functioning properly due to leadership deficits.  *Id*.  This resulted in the commercial team having low morale, high stress, and poor ways of working.  *Id*.  Plaintiff's Opposition Brief is also silent as to the indisputable facts that IKEA College Park was $500,000.00 behind its sales goal at the time of her termination and Kumar saw no progress in the development of the commercial team.  *Id*.

In her Opposition Brief, Plaintiff places significant emphasis on how her performance reviews showed improvement in her leadership abilities.   However, both her FY18 Performance

---

[8]   In her response to Defendant's Statement of Undisputed Facts, Plaintiff states IKEA cannot "claim that anyone other than Kumar was a decision maker or was otherwise involved in the process of firing Plaintiff" because Defendant answered an Interrogatory stating Kumar made the final decision regarding Plaintiff's termination.  (Doc. No. 26 at 7 ¶ 66.)  Defendant acknowledges Kumar made the *final* decision to terminate Plaintiff.  However, prior to making this decision, he consulted with Laura Pena, Jonathan Padmore, and Selwyn Crittendon.  This, ironically enough, can be seen in the emails attached to Plaintiff's Opposition as Exhibit O.

Review and her FY Performance Review show Plaintiff's leadership shortcomings.  *See* Exhibits C, D.

Even if there was some minor improvement between the two performance reviews, to survive summary judgment at the pretext stage, a complainant cannot simply show the employer's decision was wrong, mistaken, or harsh—the relevant inquiry is whether discriminatory animus motivated the employer, not whether the employer was wise, shrewd, prudent, or competent. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  The Third Circuit is clear that courts "do not sit as a super-personnel department that reexamines an entity's business decisions."  *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995).[9]  *See also Billet v. Cigna Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("Barring discrimination, a company has the right to make business judgments on employee status, especially when the decision involves subjective factors deemed essential to certain positions.")  The consistency of the reasons IKEA gives for Plaintiff's termination throughout the record show it is an honest explanation for its decision.  The fact Plaintiff thinks the decision was harsh or mistaken is frankly immaterial.

Furthermore, as stated *supra*, attached to Plaintiff's Opposition Brief are declarations from three former IKEA co-workers: Dwight Sweatt, Frank Briel, and LuCinda Branson.  As an initial matter, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."  *Kirleis v. Dickie, McCamey, & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (quoting *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)).  It is evident each of these declarations are self-serving and only offer conclusory allegations to support Plaintiff's pretext arguments.  Moreover, Plaintiff's focus on the XPO settlement and its inclusion in her

---

[9]   Rather, the "inquiry is limited to whether the employer gave an honest explanation of its behavior."  *Brewer*, 72 F.3d at 332.

FY19 Performance Review, through the declaration of Frank Briel, is nothing more than distraction. Kumar removed any reference to the XPO settlement from her FY19 Performance Review and her termination documents have no mention of it either. *See* Ex. A at 47:22-24. *See also* Ex. B at 106:1-14. Thus, it had no impact on Plaintiff's termination and should be treated as such.

Regarding Kumar's presence at IKEA College Park, it is illogical to believe two people, Dwight Sweatt and LuCinda Branson, could have been at the IKEA College Park store 24 hours a day, 7 days a week in order to truly know how much time Kumar spent there. Moreover, Kumar was asked about his time spent at the store during his deposition. He explained that he "infrequently" met with Jonathan Padmore at a Starbucks to give them more space to discuss things without being requested upon. Ex. B at 86:10-24. Besides that, after he relocated his family to the College Park area during the month of August, he was physically present at the store beginning on September 1. *Id.* at 23:4-24, 24:1-7. Moreover, Kumar had also received feedback from other co-workers, leaders, managers, and field partners regarding Plaintiff's leadership deficiencies, which was included in the Corrective Action Form she received upon termination. Ex. G.

Finally, Plaintiff suggests Kumar purposely changed the areas of the store to be reviewed during the Business Navigation Commercial Review from a set bedroom display to an area scheduled for remodel. Based on pure speculation, the declarations imply Kumar did this on purpose so the store would receive a low rating, giving him another reason to terminate Plaintiff. This argument cannot stand for two reasons. One, it is plainly irrational. As Store Manager, Kumar bears ultimate responsibility for driving his store's overall success. Thus, if his store receives a failing grade following a Business Navigation Commercial Review, it has the potential to reflect negatively upon his leadership as Store Manager, in addition to reflecting poorly on

Plaintiff's performance as Commercial Manager.  Second, these declarations are the first time in this litigation this explanation was offered by Plaintiff to explain the failing grade IKEA College Park received.  During the entirety of her deposition, Plaintiff never suggested Kumar changed the area of the store that would be examined during the Business Navigation Commercial Review. *See* Ex. A at 158:1-159:19.   Instead, Plaintiff admitted there were opportunities to be better prepared and that the commercial walk was "a very fluid meeting." *Id*.  Therefore, even if Plaintiff could satisfy a *prima facie* case of FMLA interference or retaliation (which she cannot), Plaintiff has not presented evidence to discredit the proffered reasons IKEA stated for her termination, and Defendant is entitled to summary judgment.

## III.  CONCLUSION

Plaintiff originally brought three claims based on FMLA retaliation/interference and age discrimination.  In opposing Defendant's Motion for Summary Judgment, Plaintiff acknowledged she could not meet her burden on her age discrimination claims and voluntarily dismissed the claims from her case.  Her FMLA claims are similarly deficient, as Plaintiff cannot show she invoked her right to FMLA-qualifying leave.  Equally fatal to her FMLA claims, there is no temporal proximity between Plaintiff's termination and the supposed invocation of her rights. Based on this, the Court can dismiss the claims for failure to establish a *prima facie* case. Nevertheless, the undisputed evidence establishes IKEA terminated Plaintiff because the commercial team was underperforming and Kumar, along with other IKEA co-workers, believed this was due to Plaintiff's leadership deficiencies.  Accordingly, IKEA respectfully requests this Court grant its Motion and dismiss Plaintiff's Complaint with prejudice.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.

/s/ Brandon R. Sher
Brandon R. Sher
1735 Market Street, Suite 3000
Philadelphia, PA 19103
Telephone: 215-995-2840
Fax: 215-995-2801
brandon.sher@ogletree.com

Attorney for Defendant
IKEA US RETAIL LLC