IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LORI THOMPSON,<br><br>    Plaintiff,<br><br> v.<br><br>IKEA US RETAIL, LLC,<br><br>    Defendant. | CIVIL ACTION<br>NO. 21-5288 |

## OPINION

Slomsky, J.                      April 27, 2023

### TABLE OF CONTENTS

I. **INTRODUCTION** ............................................................................................... 1

II. **BACKGROUND** ................................................................................................ 1

 A. **Plaintiff's 2018 Annual Performance Review** ......................................... 2

 B. **XPO Logistics Settlement** ......................................................................... 4

 C. **Sanjay Kumar Replaces Frank Briel as Store Manager at IKEA College Park** ........ 5

 D. **Plaintiff Informs Kumar about Her Upcoming Surgery** ........................ 5

 E. **IKEA's Family Medical Leave Act Policy** ............................................... 6

 F. **Plaintiff's 2019 Annual Performance Review** ......................................... 7

 G. **The 2019 Business Navigation Commercial Review** ............................... 8

 H. **Plaintiff's Termination** ............................................................................. 9

III. **STANDARD OF REVIEW** ............................................................................. 13

IV. **ANALYSIS** ....................................................................................................... 14

**A. A Reasonable Factfinder Could Find That Defendant Interfered with Plaintiff's Rights under the FMLA** ................................................................ 15

    1. Genuine Disputes of Material Fact Exist as to Whether Defendant Was on Notice of Plaintiff's Intent to Take FMLA Leave .............................. 15

    2. Genuine Disputes of Material Fact Exist as to Whether Plaintiff Was Denied Her Entitled-to Benefits under the FMLA ..................................................... 17

**B. A Reasonable Factfinder Could Find That Defendant Retaliated against Plaintiff for Exercising Her Rights under the FMLA** ..................................... 19

    1. Genuine Disputes of Material Fact Exist Regarding the Causation Prong of Plaintiff's FMLA Retaliation Claim That Preclude Summary Judgment in Defendant's Favor ...................................................... 20

        a. Temporal Proximity ..................................................................... 22

        b. "Other Evidence in the Record" Reveals an Inference of Retaliation ..................... 22

    2. Defendant Provided a Legitimate Nonretaliatory Reason for Terminating Plaintiff .... 25

    3. Genuine Disputes of Material Fact Exist as to Whether Defendant's Proffered Legitimate Nonretaliatory Reasons for Terminating Plaintiff Were Mere Pretext .............................................................................. 25

**V. CONCLUSION** ................................................................................. 27

## I.    INTRODUCTION

Plaintiff Lori Thompson ("Plaintiff" or "Thompson") was employed at the College Park, Maryland store of Defendant IKEA US Retail, LLC ("Defendant" or "IKEA") starting in 2007 and became its Commercial Manager at some point during her twelve years of employment.   In September 2019, a new Store Manager, Sanjay Kumar, was hired.   Shortly after Kumar was hired, Thompson informed him that she needed to take time off in early 2020 for hernia surgery that she would schedule for when the store was less busy.   Although Kumar did not appear to have any problem with her request for time off, Thompson alleges that he set out to manipulate a review of her performance and of her Commercial Team to reflect negatively on her work at IKEA. Thompson alleges that Kumar did so to cover up his real reason for terminating her—notifying him that she would be taking medical leave.   Ultimately, her employment at the College Park store was terminated on December 3, 2019 for poor performance and leadership.   On December 2, 2021, Thompson filed this lawsuit against IKEA alleging that it interfered with and retaliated against her for invoking her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. (Count I).[1]   (Doc. No. 1.)

## II.    BACKGROUND

Plaintiff Lori Thompson was thirty-eight (38) years old when she was hired in March 2007 by Defendant IKEA as a Logistics Manager in its College Park, Maryland store ("IKEA College Park" or "College Park store").   (Doc. No. 23-3 at 1.)   In 2016, she became the Interim Operations Manager at IKEA College Park.   (Id.)   Some time after this assignment and after a company-wide

---

[1]   Plaintiff withdrew two other claims alleged in her Complaint:   (1) a violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. (Count II); and (2) a violation of the Maryland Fair Employment Practices Act, Md. Code, State Gov't § 20-602 (Count III). (See Doc. No. 26-2 at 5 n.1.)

reorganization that affected IKEA College Park, Plaintiff was promoted to Commercial Manager.[2]
(Id.)  As Commercial Manager, Plaintiff led the Commercial Team and oversaw all commercial
aspects of the store, including merchandising basics, communication, interior design, and product
quality.  (Id.; Doc. No. 26 at 1.)  She also was responsible for driving sales and optimizing
profitability.  (Doc. No. 23-3 at 2.)  Throughout most of her tenure as Commercial Manager,
Plaintiff reported to Frank Briel, the Store Manager of IKEA College Park.[3]  (Id.)

### A.      Plaintiff's 2018 Annual Performance Review

Every year on September 1—the beginning of IKEA's fiscal year—IKEA begins its annual
employee review process, which has three parts:  (1) the Start-Up Talk; (2) the Follow-Up Talk;
and (3) the Performance Review.  (Id.)  In fiscal year 2018, during Plaintiff's Start-Up Talk (the
first step in the annual review process), Briel commented that "Lori will develop the business but
at what cost.  While she might encourage and challenge coworkers she often leads thru [sic] force.
She won't be able to take more responsibilities until she can admit her mistakes and identify her
weaknesses.  Her obsession to remain perfect drives people away from her."[4]  (Id.)  The 2018
Annual Performance Review does not include any comments regarding the Follow-Up Talk
portion of the employee review process.

And regarding Plaintiff's Performance Review for 2018, which was written by Store
Manager Briel, the Review states, in relevant part:

> I promoted Lori to commercial manager because I thought she could get things
> done while maintaining the logistics operation.  She might become a strong

---

[2]   The reorganization was known as Organizing for Growth ("O4G").  (Doc. No. 23-3 at 1.)

[3]   Plaintiff describes Briel as an honest person and a fair manager.  (Id. at 2.)

[4]   Briel also stated that Plaintiff should "[c]ontinue to develop James [another IKEA employee],
accepting just because he has a different view doesn't mean he is wrong.  Work thru [sic] your
frustrations, giving him the silent treatment is not productive."  (Id. (footnote omitted).)

commercial manager if she accepts that she needs to change to be successful.[] The number one thing for her too [sic] learn [is] to admit your weaknesses, including being too competitive and ask for help when needed. . . .  In a recent meeting I challenged her on a point and she asked me for an example.  When I gave her the example she denied it, while her peers sat in the room in amazement.  Admit your mistakes, [a]dmit when you don't know something, talk about your weakness. During Lori's interviews for DSM it was pointed out that she only talks about her accomplishments and her strengths, she cannot admit her mistakes.  [U]ntil this happens she will always have a contentious relationship with her boss and her peers. People are tired of walking on eggshells around her.  There is NO reason that with her background her concept knowledge should be strong, but she doesn't ask for help or believe me when I tell her about the concept.  With her managers she believes in loyalty first and knowledge second.  Understand that some of the people close to you are using this to manipulate your decisions.

Lori is clearly two people – one, open and honest and a champion for D&I.  The other is a bully – never wrong, willing to defend herself and her mistakes with all of her energy.  This keeps her peers and subordinates off balance and away from her.

(Doc. No. 23-7 at 2.)  The Performance Review also referenced Plaintiff's management skills:

It has been one year since the rollout of O4G [("Organizing for Growth")].  There have been many challenges, not the least being the merch basics team.  The team[']s biggest challenge is the day to day management on the floor.  Lori needs to set expectations for her managers both salaried and hourly and hold them accountable and follow up daily.  If they are not the right fit let[']s find managers who are!! What is the work, who is assigned and how will it get done.  Logistics has always been Lori[']s forte while this has continued to run OK we need to make sure that all managers are working in a professional way this includes scheduling, PTO, inter personal conflicts.

(Id. at 3.)

In the Performance Review, Briel also reviews Plaintiff's "Leadership capabilities" in seven categories as "Partly Meets Expectations," "Meets Expectations," or "Exceeds Expectations."  (Id. at 5.)  The Performance Review contained one "Exceeds Expectations," three "Meets Expectations," and three "Partly Meets Expectations."[5]  (Id. at 5-6.)  The Performance

---

5   Plaintiff received "Exceeds Expectations" for "[d]evelop the business & deliver results."  (Doc. No. 23-7 at 5.)   Plaintiff received "Meets Expectations" for "[l]ead and develop people,"

Review also references Plaintiff's performance in various assignments.  (Id. at 2-3.)  She received "Meets Expectations" in ten Assignments, "Partly Meets Expectations" in two Assignments, and "Exceeds Expectations" in one Assignment.[6]  (Id.)  After reviewing her 2018 Performance Review and not disputing it, Plaintiff signed it.[7]  (Doc. No. 23-3 at 3.)

**B.     XPO Logistics Settlement**

Plaintiff alleges that she discovered some time in August of 2019 that XPO Logistics ("XPO") had been overbilling the College Park store for assembly fees over an extended period of time.  (Id. at 4; Doc. No. 26 at 2.)  She further claims that she "personally and single-handedly negotiated a settlement between IKEA College Park and . . . XPO."  (Doc. No. 1 at 4.)  In response to her successful settlement, Briel allegedly "thanked Plaintiff personally for her work and due diligence multiple times and he lauded her and her results in front of the entire management team on at least three other occasions."[8]  (Id.)  In a sworn Declaration, Briel described that "[w]hat Lori Thompson accomplished [with the IKEA-XPO settlement]" was "unquestionably for the benefit of the store and was a positive thing."  (Doc. No. 26-4 at 3.)

---

"[e]nable change," and "IKEA Values."  (Id. at 5-6.)  Plaintiff received "Partly Meets Expectations" for "[i]nspire and clarify," "[c]reate togetherness," and "[f]ind better ways."  (Id.)

[6]  The thirteen Assignments appear to be individualized assignments provided to Plaintiff by Briel.  Some of the Assignments include "[e]nable[] the IKEA mechanical sales system to work efficiently and ensure[] the continued success of the IKEA Concept" and "[e]nsure[] leaders understand the multi-channel retail environment they are working in and know how to use this in the best and most commercial way for different customers."  (Id. at 2.)

[7]  During Plaintiff's Start-Up Talk for the fiscal year 2019 annual review process, she requested bi-weekly meetings with Briel in order "to address [her] shortcomings as they happen" and to help her work "to improve [her] leadership."  (Id.)

[8]  Specifically, Plaintiff alleges she received special recognition "during the College Park Manager's Meeting, in 'What's Up College Park,' and at the All Store Meeting."  (Doc. No. 26 at 3.)

4

C.      **Sanjay Kumar Replaces Frank Briel as Store Manager at IKEA College Park**

During Briel's tenure at IKEA College Park, he was known as a Value Added Participation Store ("VAPS") Manager.  (Doc. No. 23-3 at 4.)  A VAPS Manager has a partial ownership interest in the store they manage, which incentivizes them to meet certain sales goals.  (Id.)  Briel departed IKEA College Park because his six-year term as a VAPS Manager at the College Park store had ended.  (Id.)  On September 1, 2019, when Briel's term as VAPS Manager ended, Sanjay Kumar became Store Manager at IKEA College Park.  (Id.; Doc. No. 26-4 at 2.)

D.      **Plaintiff Informs Kumar about Her Upcoming Surgery**

Between September 11, 2019 and September 25, 2019, Plaintiff met with Kumar.  (Doc. No. 23-3 at 7.)  She "had seen a doctor" and "was going to need hernia surgery[.]"[9]  (Id. at 8.) Plaintiff states that she told Kumar that she planned on scheduling the surgery for "February or March of 2020 which were typically slower periods in the store."  (Id.)  Plaintiff testified at her deposition that when she spoke with Kumar, they did not know whether she would be using paid time off, sick leave, or FMLA leave until after the surgery occurred, and that Kumar could have interpreted her statements to mean that she planned on taking paid time off or sick leave for the surgery.[10]  (Id. at 9.)  Nonetheless, Kumar's response to her comments regarding her hernia surgery was simply stating "Okay."[11]  (Doc. No. 23-3 at 7.)  After Plaintiff told Kumar about her surgery, they continued their conversation and discussed other topics.  (Id.)

---

[9]   No one else was present for this conversation and Plaintiff did not inform any other member of IKEA's senior management that she was going to need surgery.  (Doc. No. 23-3 at 7.)

[10]   However, as discussed in more detail infra, Plaintiff correctly argues that there are no "magic words" required "to invoke the Family [] Medical Leave Act.  She does not even need to use the words "Family [] Medical Leave Act."  (Doc. No. 26 at 6-7.)

[11]   Kumar testified at his deposition that he remembered that he and Plaintiff "were walking down the corridor hallway at the College Park store, and she let me know that she needed to take time off for something health-related."  (Doc. No. 23-6 at 19.)

On September 24, 2019, which is during the time period when Plaintiff asserts she invoked her FMLA rights, Selwyn Crittendon, who is Kumar's direct supervisor, sent an email to Lesley Mancuso, a district sales advisor for IKEA College Park telling her to "keep Sanjay [Kumar] in the loop as he has discovered the root of his leadership issues that I can discuss with you in person." (Doc. No. 26-6 at 2.)  Kumar testified at his deposition that he did not know what Crittendon was referring to in that email and that he did not discuss any leadership issues he perceived at the College Park store in September of 2019.  (Doc. No. 23-6 at 19.)

**E.      IKEA's Family Medical Leave Act Policy**

Defendant maintains that Plaintiff did not notify IKEA in writing of her need to take leave under the FMLA and understood that she could not orally give notice of her need for FMLA leave. (Doc. No. 23-3 at 8.)  Plaintiff, on the other hand, maintains that under the FMLA, she does not "have to place anything in writing as a prerequisite to being protected under that Act."  (Doc. No. 26 at 7.)  Nevertheless, it is necessary to identify the relevant portions of IKEA's FMLA policy (the "Policy") below:

> **[C]o-worker obligations for [FMLA] leaves**
>
> **[P]rovide notice of the need for leave**
> Co-workers who take FMLA leave must notify IKEA of their need for FMLA leave in writing.  At the time you notify IKEA of the need for leave, you will be given FMLA paperwork to complete which must be completed and submitted to Human Resources prior to the commencement of leave.  When leave is foreseeable for childbirth, placement of a child or a planned medical treatment for the co-worker's, a family member's serious health condition, or to care for a covered servicemember, co-workers must provide the Company with at least 30 days advance notice, or such shorter notice as is practicable under the circumstances (i.e., within 1 or 2 business days of learning of the need for leave).  When the timing of the leave is not foreseeable, co-workers must provide IKEA with notice of the need for leave as soon as practicable (i.e., within 1 or 2 business days of learning of the need for leave).
> . . .
> **[C]ooperate in the scheduling of intermittent leave or reduced work schedule**

If co-workers take leave intermittently or on a reduced work schedule basis, co-workers must, when requested, attempt to schedule the leave so as not to unduly disrupt IKEA operations. . . .

(Doc. No. 23-9 at 2-3.)

F.     **Plaintiff's 2019 Annual Performance Review**

Plaintiff's 2019 Performance Review rated each of her seven "Leadership capabilities" as "Meets Expectations."[12]  (Doc. No. 23-8 at 5-6.)  Moreover, out of the thirteen "Assignments," Plaintiff received the "Meets Expectations" rating eleven times and received the "Partly Meets Expectations" rating twice.  (Id. at 2-3.)  The 2019 Performance Review also included several comments about improving her performance and goals for fiscal year 2020.  These comments suggested that Plaintiff improve her leadership skills and logistics, train Commercial Team employees, spend more time on the floor, and be "an agent of change," among others.  (Doc. No. 23-8 at 9.)  Plaintiff signed the 2019 Performance Review.  (Doc. No. 23-3 at 5.)

According to his Declaration submitted by Plaintiff in opposition to the Motion for Summary Judgment, Briel "prepared draft Performance Reviews [for fiscal year 2019] for the entire senior management team of the store in an effort to facilitate [his] successor's completion of the review process."  (Doc. No. 26-4 at 3.)  The parties dispute whether Kumar used, adopted, or modified the draft 2019 Performance Review of Plaintiff prepared by Briel.  (Compare Doc. No. 23-3 at 5, with Doc. No. 26 at 3.)  Defendants contend that Kumar signed and reviewed her 2019 Performance Review of Plaintiff in which Briel outlined his clear expectations for Plaintiff. (Doc. No. 23-3 at 5.)  Plaintiff, on the other hand, maintains that Kumar did not use Briel's draft,

---

[12] Plaintiff disputes Defendant's contention that the 2019 Performance Review "again revealed Plaintiff's leadership deficiencies . . . ."  (Doc. Nos. 23-3 at 5; 26 at 4.)  However, in his Declaration, Briel stated that "[b]etween her Performance Review of [fiscal year] 2018 and my preparation of her Performance Review for [fiscal year] 2019, [he] believed that Lori Thompson had made improvement in her performance and in her leadership skills."  (Doc. No. 26-4 at 3.)

but rather that he "modified, manipulated and changed what Briel submitted before initially presenting it to Plaintiff." (Doc. No. 26 at 3.)

### G.    The 2019 Business Navigation Commercial Review

On October 1, 2019, IKEA College Park conducted another review, this time a business navigation commercial review (the "2019 Commercial Review"), the purpose of which was to help the Commercial Team drive sales and maximize opportunity. (Id. at 6; Doc. No. 23-13 at 2.) "During a business navigation commercial review, the commercial team, which was managed by [Plaintiff], ordinarily prepares and shows a display room to Defendant's senior sales team." (Id.) For this review, IKEA College Park received a score of forty-one (41) percent. (Id.) A passing score is seventy-five (75) percent. (Id.) Based on this score, Plaintiff admitted the store needed "improvement" and that it had "things to work on." (Id.)

Plaintiff avers, however, that the 2019 Commercial Review also was manipulated by Kumar. (Doc. No. 26 at 14.) In support of her claim, she relies on Declarations of Dwight Sweatt, Frank Briel, and Lucina Branson. Sweatt worked for IKEA College Park as a Lead in Active Selling during the 2019 Commercial Review, and Branson worked for the store as a Team Lead on the Commercial Team during the 2019 Commercial Review. (See Doc. Nos. 26-3 at 2; 26-13 at 2.)

Plaintiff argues that the Store Manager has discretion to change what room or display will be reviewed. (Id.) She asserts that Kumar used this discretion to get "the reviewing team to interrupt Plaintiff's presentation and switch to a room in a neglected area of the store for which a remodel and fixture replacement was already planned so he could make Plaintiff look bad." (Doc. No. 26 at 14.) Specifically, Plaintiff maintains that the 2019 Commercial Review was scheduled

to review a bedroom display in the IKEA College Park store, but this review was moved to the neglected area.  (Id.)

Moreover, Plaintiff claims that "[t]he report of that review in fact did criticize things at the store for which [her] commercial team was not responsible."  (Id.)  Plaintiff contends that the manipulated 2019 Commercial Review was issued in retaliation for her notifying Kumar of her intent to take medical leave.  It was one of the bases of the Corrective Action terminating her employment.

### H.      Plaintiff's Termination

On December 3, 2019, Kumar filed the Corrective Action against Plaintiff and terminated her employment with IKEA.  (Doc. No. 23-3 at 8.)  Both parties concede that Kumar made the final decision to terminate her employment.  (Doc. Nos. 1 at 6; 26 at 7.)  However, Defendant contends that prior to terminating her employment, Kumar "received approval from Market Area People & Culture Manager Laura Pena, IKEA College Park Unit People & Culture Manager Jonathan Padmore, and Market Area Manager Selwyn Crittendon—Kumar's supervisor.  Kumar also consulted with the IKEA legal team."[13]  (Doc. No. 23-3 at 8.)  Plaintiff, on the other hand, argues that "Defendant may not claim that anyone other than Kumar was a decision maker or was

---

[13] Based on emails between Kumar, Selywn, Crittendon, and Laura Pena, it appears that the earliest that Plaintiff's termination was discussed was on November 15, 2019.  On Monday, November 18, 2019, Kumar sent an email to Crittendon and Pena stating that he "look[s] forward to touching base with [them] today on what we discussed on Friday" and sought their advice on revising the Corrective Action, which is a form used to terminate an IKEA employee. (Doc. No. 26-10 at 2.)  On November 21, 2019, Kumar sent another email to Crittendon and Pena informing them he "made some adjustments based on the feedback [he] received."  (Id. at 4.)  It appears that Pena also sent the recently revised Corrective Action to Leigh Culpan, Associate General Counsel for employment-related matters at IKEA.  (See id.)  On November 22, 2019, Crittendon sent an email to Kumar letting him know that she "got some feedback from Legal."  (Id. at 3.)

otherwise involved in the process of firing [her]." (Doc. No. 26 at 7.)  Plaintiff's argument rests

on Defendant's response to her one of her Interrogatories requesting that Defendant:

> 5.      Identify all employees and/or contractors of IKEA who:
>   a. Made the final decision to terminate Ms. Thompson's employment;
>
>   b.  Were involved in reaching the decision to terminate Ms. Thompson's
> employment;
>
>   c.  Provided information relied upon [by] the decision maker in reaching the
> decision to terminate Ms. Thompson's employment;
>
>   d.  Were involved in any investigation of Ms. Thompson's conduct and/or
> performance antecedent to the decision to terminat[e] her employment;
>
>   e.  Were present in the room when Ms. Thomspon was terminated.

(Doc. Nos. 26 at 8; 26-7 at 7.)  Defendant

> object[ed] to this interrogatory because it is vague and ambiguous, particularly with
> respect to the phrase "involved in reaching the decision."  Defendant also objects
> to the interrogatory because it is overbroad, unduly burdensome, disproportionate
> to the needs of the case, and oppressive in that literal compliance with it would
> require Defendant to conduct an unreasonable investigation on Plaintiff's behalf to
> ascertain the facts sought.  Defendant further objects to this interrogatory to the
> extent it seeks information protected by the attorney-client privilege and/or the
> work-product doctrine[.]  Subject to and without waiving these objections or the
> General Objections above, Sanjay Kumar made the final decision to terminate
> Plaintiff's employment.  By way of further response, Defendant refers Plaintiff to
> Plaintiff's December 3, 2019 Corrective Action.

(Doc. No. 26-7 at 8.)[14]

The December 3, 2019 Corrective Action terminating Plaintiff was based on a policy

violation for a "[p]erformance issue." (Doc. No. 23-11 at 2.)  The Corrective Action, authored by

Kumar, states, in relevant part:

---

[14] Based on this response, Plaintiff claims that "[a]t best, any claim or testimony that he relied
upon anyone else, conferred with anyone else, or secured the agreement of anyone else
contradicts his own sworn affirmation to the Answers to Interrogatories, thereby creating a
genuine issue of material fact." (Doc. No. 26 at 9.)

[T]he commercial team at IKEA College Park is and has been underperforming at a level that cannot be sustained for success of the co-worker and business.  Since coming to IKEA College Park, I have seen no progress in development of the commercial team that will lead to long-term success.

. . .

Feedback from co-workers, leaders, manager, and field/SO partners as well as my own observations are that the departments within the commercial team are not functioning properly due to deficits in leadership, expectations, and vision, and execution of routines.

. . .

The negative impact to our co-worker population and to our business is evidenced through the lack of structure, expectations, and leadership.  This resulted in a commercial team . . . with low morale, high stress, and poor ways of working.

Sales at the beginning of the year were on par to meet goal.  As a result of the failure of the commercial team to execute the basics in a timely manner and raise the base from a co-worker morale perspective, we are now more than $500,000 behind our goal and continue to face missed-sales opportunities.

. . .

As a senior member of the leadership team you were expected to provide your team with a clear direction and support them in being able to achieve their goals per your core responsibilities/assignments as well as expectations set forth by myself as early as our first 1:1 [(one-on-one)] on 08/12/2019 of improving the commerciality of the store through your team.  . . .

You were expected to provide adequate training as well as follow-up on the effectiveness of the training that has been provided.  Instead, you have gone from task to task rather than truly lead the team.  . . .  In being supportive, you were expected to be less directive and coach more to help foster proper growth.

. . .

During our first 1:1 on 08/12/2019, I discussed my expectations with you.  In addition, I specifically identified issues and areas that were not negotiable.  My expectations were:  that we have a culture of accountability, everything we do add[s] value, and always strive to do better.  My non-negotiables were:  we do everything right and don't jeopardize our integrity, live the IKEA values, and that we take care of our people.

. . .

As stated before, your inability to be an effective leader in coordination with the IKEA Values has resulted in a negative impact to our co-worker and business.  To achieve our goals, strong leadership is the only way forward.  As such, the decision is to terminate employment.  As per the "At-Will Employment" Policy, IKEA has the right to end a co-worker's employment at any time, with or without reason and with or without notice.

(Id.)  Plaintiff asserts she was improperly terminated by Kumar because he never spoke to her about her performance.  (Doc. No. 23-3 at 9.)[15]

Plaintiff contends that this December 3, 2019 Corrective Action is "proof of pretext for the real reason Kumar terminated Plaintiff."  (Doc. No. 26 at 9.)  To support her claim, Plaintiff asserts that:

> as Kumar was creating the Corrective Action in November of 2019, he was also communicating regularly with Plaintiff via Microsoft Teams chat and telling her things like "Awesome really nice job LT!" . . . ; "once I'm back I'll be able to support in whatever way I can better . . . ." []; and "Let me know how I can support you and Brandon" . . . .

(Id.)[16]

---

[15] However, IKEA does not have a "progressive disciplinary policy" that requires verbal and written warnings prior to termination.  (Id. at 10.)  Rather, IKEA's Corrective Action Policy states, in relevant part, that:

> The corrective action process is intended to give co-workers notice, when IKEA deems appropriate, of problems with their conduct or performance in order to provide them an opportunity to improve.  The Corrective Action form is used to document that unsatisfactory performance and/or violation of rules, with stated expectations and consequences for non-improvement.
> . . .
> When IKEA believes a co-worker's performance is unacceptable or violates rules, the severity of any corrective action, up to [and] including termination, falls within the Company's sole discretion.

(Doc. No. 23-10 at 2-4.)

[16] These messages took place between October 16, 2019 and November 25, 2019 and appear to discuss Plaintiff's supervision both of the Commercial team while Kumar was away from the store and of a newer employee at the College Park Store.  (See Doc. No. 26-11 at 10-14.)  Kumar tells Plaintiff in one message:  "Awesome really nice job LT! I'm glad to hear about the team working in a better way together, right on.  Once I'm back I'll be able to support in whatever way I can better, just been a whirlwind week."  (Id.)  These messages were exchanged after Plaintiff notified Kumar of her intent to take medical leave.  Some messages were exchanged just days after Kumar had sent an email to Crittendon and Pena seeking feedback for his draft Corrective Action form, which occurred between November 18, 2019 and November 22, 2019. (See Doc. No. 26-10.)

Plaintiff further claims that Kumar could not have made observations about her performance because he "was not routinely in the College Park, MD store until January of 2020." (Id. at 13; Doc. Nos. 26-3 at 2; 26-13 at 2.)  Defendant, on the other hand, maintains that "after he relocated his family to the College Park area during the month of August, he was physically present at the store beginning on September 1[, 2019]."  (Doc. No. 27 at 8 (citing Doc. No. 23-6 at 8).)

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Hart v. Elec. Arts, Inc., 717 F.3d 141, 148 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  "A dispute 'is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.'"  Moody v. Atl. City Bd. of Educ. 870 F.3d 206, 213 (3d Cir. 2017) (citing Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)).  A disputed fact "is material only if it might affect the outcome of the suit under governing law."  Id.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Meditz v. City of Newark, 658 F.3d 364, 369 (3d Cir. 2011) (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247–249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.    ANALYSIS

In Count I of the Complaint, Plaintiff alleges that Defendant IKEA both (1) retaliated against Plaintiff for exercising her rights under the Family Medical Leave Act ("FMLA") and (2) "interfered with Plaintiff's right to take leave under and pursuant to the FMLA."  (Doc. No. 1 at 11-12.)   In particular, she alleges that "Defendant's decision to terminate the Plaintiff was motivated in substantial part by Plaintiff's request to take FMLA [leave] in February of 2020." (Id. at 11.)  Plaintiff asserts that Kumar modified and manipulated her 2019 Annual Performance Review and her 2019 business navigation commercial review, the latter of which he conducted about two weeks after Plaintiff informed him about her need to schedule hernia surgery.  (Id. at 11-12.)  She claims that the manipulated reports served as mere pretext for retaliating against her because she exercised her FMLA rights.  (Id. at 11-12.)

Defendant asserts, however, that Kumar made the decision to terminate Plaintiff because of her Commercial Team's underperformance, the Team's low morale and high stress, and Plaintiff's lack of leadership.  (Doc. No. 23-2 at 15.)  But when viewing Plaintiff's evidence in the light most favorable to her, she has raised genuine disputes of material fact that would allow a

14

reasonable jury to find in her favor on both FMLA claims alleged in Count I of the Complaint. Thus, IKEA's Motion for Summary Judgment will be denied.

### A.    A Reasonable Factfinder Could Find That IKEA Interfered with Plaintiff's Rights under the FMLA

"[W]hen employees invoke rights granted under the FMLA, employers may not 'interfere with, restrain, or deny the exercise of or attempt to exercise' these rights.  Nor may employers 'discharge or in any manner discriminate against any individual for opposing any practice made unlawful.'"  Capps v. Mondelez Global, LLC, 847 F.3d 144, 151 (3d Cir. 2017) (quoting Ross v. Gilhuly, 755 F.3d 185, 191 (3d Cir. 2014)) (citations and footnotes omitted)).

In order to establish a claim of FMLA interference, a plaintiff must establish:

> (1) . . . she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of . . . her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which . . . she was entitled under the FMLA.

Capps, 847 F.3d at 155 (quoting Ross, 755 F.3d at 191-92 (citation omitted)).

The first, second, and third prongs are not disputed by the parties in this case, so only the fourth and fifth elements of FMLA interference are at issue.  For reasons that follow, there are genuine disputes of material fact regarding the fourth and fifth prongs of Plaintiff's FMLA interference claim that preclude summary judgment in Defendant's favor.

### 1.    Genuine Disputes of Material Fact Exist as to Whether Defendant Was on Notice of Plaintiff's Intent to Take FMLA Leave

Defendant asserts that the fourth element of Plaintiff's FMLA interference claim—notice—does not survive summary judgment because "she did not convey the necessary information to put IKEA on notice that she would take FMLA leave."  (Doc. No. 23-2 at 11.) Specifically, Defendant argues that Plaintiff did not provide adequate notice that she would request

FMLA leave because she did not tell Kumar (1) "how long she intended to be out for surgery or the duration of any possible recovery time" or (2) what type of leave she was seeking—FMLA, sick, or paid time off ("PTO").  (Id. at 11-12.)  In addition, Defendant claims that Plaintiff did not provide adequate notice because "in order to qualify for FMLA leave, a co-worker must notify IKEA in writing of their need for leave."  (Id. at 12.)  Plaintiff, on the other hand, contends that her conversation with Kumar informing him of the surgery she would schedule for February 2020 constituted adequate notice.

In Lichtenstein v. University of Pittsburgh Medical Center, the Third Circuit described a plaintiff's burden to survive summary judgment stage on the fourth element of a FMLA interference claim—notice:

> To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave.  29 U.S.C. § 2612(e)(2).  In doing so, the employee "need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b).  When the leave is unforeseeable, the employee's obligation is to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  Id. (emphasis added).  As we have previously noted, this is not a formalistic or stringent standard. See Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007) . . . .

> While the FMLA "does not require an employer to be clairvoyant," Brenneman v. MedCentral Health Sys., 366 F.3d 412, 428 (6th Cir. 2004), this does not mean that employees need to provide every detail necessary for the employer to verify if the FMLA applies. . . .  This conclusion is dictated by the language of 29 C.F.R. § 825.303(a), which provides that "where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying" (emphasis added).  The regulations thus clearly envision situations where an employee can satisfy her notice obligation without providing enough detailed information for the employer to know if FMLA actually applies. Accordingly, the "critical test" is not whether the employee gave every necessary detail to determine if the FMLA applies, but "how the information conveyed to the employer is reasonably interpreted."  Sarnowski, 510 F.3d at 402.

16

691 F.3d 294, 303 (3d Cir. 2012).  The court in <u>Lichtenstein</u> also held that "[h]ow the employee's notice is reasonably interpreted is generally a question of fact, not law."  <u>Id.</u>

Plaintiff testified at her deposition that at some time between September 11, 2019 and September 25, 2019, she told Kumar that she had seen a doctor and that she needed hernia surgery. (<u>See</u> Doc. No. 23-5 at 8.)  She also told Kumar that it was her "intention to not schedule the surgery until February or March of 2020 which were typically slower periods in the store."  (<u>Id.</u>; Doc. No. 26 at 6.)  In addition, Kumar also remembers that he and Plaintiff "were walking down the corridor hallway at the College Park store, and she let me know that she needed to take some time off for something health-related."  (Doc. No. 23-6 at 19.)  A reasonable jury could conclude that Plaintiff provided Kumar enough information to either permit him to reasonably determine that the FMLA would apply to her request or trigger his duty to "inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying."  29 C.F.R. § 825.303(a).  Plaintiff therefore has satisfied the fourth element of FMLA interference and need only show a genuine dispute of material fact regarding the fifth element—denial of FMLA benefits.

### 2.    Genuine Disputes of Material Fact Exist as to Whether Plaintiff Was Denied Her Entitled-to Benefits under the FMLA

Plaintiff has met her burden to adduce sufficient evidence to permit a reasonable trier of fact to find on the fifth element of the interference claim that she was denied FMLA benefits she would have enjoyed but for her termination.  But, as an initial matter, Defendant contends that "FMLA claims predicated on an employee's termination are construed as retaliation claims," not as interference claims.  (Doc. No. 23-2 at 10 n.4 (citing <u>Stephenson v. JLG Indus.</u>, No. 09-1643, 2011 WL 1304625, at *5 (M.D. Pa. Mar. 31, 2011).  For this reason, Defendant contends that Plaintiff's FMLA interference claim fails as a matter of law.  However, Defendant's argument is

without merit and, for the following reasons, a reasonable jury could find that Plaintiff was denied the benefits she would have been entitled to receive under the FMLA but for her termination.

The Third Circuit has held that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Hansler v. Lehigh Valley Hosp. Network, 798 F.3d 149, 159 (3d Cir. 2015) (quoting Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009)). In accordance with Erdman, several courts have held that termination constitutes a denial of FMLA benefits, the fifth element of a FMLA interference claim. See Hansler, 798 F.3d at 159 (quoting Erdman, 582 F.3d at 509); Zelesnick v. Temple Univ. Health Sys., No. 19-5820, 2021 WL 201300, at *10 (E.D. Pa. Jan. 19, 2021) (rejecting the defendants' argument that "where a plaintiff claims that FMLA leave was a reason for termination, the claim must be considered as a claim for retaliation, not interference"); May v. PNC Bank, 434 F. Supp. 3d 284, 303 (E.D. Pa. 2020) (stating that plaintiff's FMLA interference claim that "but-for her termination, she would have been entitled to and would have taken FMLA leave after the birth of her child" was distinct from her FMLA retaliation claim); DeCicco v. Mid-Atl. Healthcare, LLC, 275 F. Supp. 3d 546, 564 (E.D. Pa. 2017) ("The Third Circuit's decision in Erdman instructs that a plaintiff's termination for making a valid request for FMLA leave may constitute interference with his FMLA rights, and Kohler [v. TE Wire & Cable LLC, No. 14-3200, 2016 WL 885045 (D.N.J. Mar. 8, 2016)] persuasively cautions that summary judgment should be denied where a plaintiff's termination allegedly resulted in benefits being withheld.").

Here, viewing the facts in the light most favorable to Plaintiff as the non-movant opposing summary judgment, a reasonable factfinder could find that if Plaintiff had not been terminated by IKEA, then she would have been able to exercise her rights under the FMLA to take medical leave

during her recovery from the hernia surgery. Kumar was aware that Plaintiff would have taken medical leave for the surgery and Defendant does not dispute whether Plaintiff would have taken medical leave but for the termination of her employment. Accordingly, because Plaintiff has demonstrated sufficient evidence that would permit a reasonable jury to find that Defendant interfered with her FMLA benefits by terminating her before she was able to take FMLA leave, summary judgment on her FMLA interference claim will be denied.

> **B.     A Reasonable Factfinder Could Find That Defendant Retaliated against Plaintiff for Exercising Her Rights under the FMLA**

Under the FMLA, employers are prohibited "from retaliating against employees who exercise their rights, refusing to authorize leave, manipulating positions to avoid application of the Act, or discriminatorily applying policies to discourage employees from taking leave." Callison v. City of Phila., 430 F.3d 117, 120 (3d Cir. 2005) (citing 29 C.F.R. § 825.220). At the summary judgment stage, a FMLA retaliation claim based on circumstantial evidence is assessed under the three-step burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 346 (3d Cir. 2022) (applying the McDonnell Douglas burden-shifting framework to FMLA retaliation claims). First, the plaintiff must submit sufficient facts to show a genuine dispute of material fact regarding her prima facie case of FMLA retaliation. Second, the burden shifts to the employer to show that it had a legitimate, non-retaliatory reason for terminating the plaintiff. If the employer makes such a showing, then the burden shifts back to the plaintiff to show that the employer's proffered reasons are a pretext for unlawful retaliation.

Accordingly, under the first step of the McDonnell Douglas framework, to establish a prima facie case for "retaliation . . . under the FMLA, the plaintiff must [initially] prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision,

and (3) the adverse action was causally related to her invocation of rights." <u>Lichtenstein</u>, 691 F.3d at 301-02 (citing <u>Erdman</u>, 582 F.3d at 508-09).  If these three elements are shown by a plaintiff, then the burden shifts to the employer to show that it had a legitimate, non-retaliatory reason for terminating the plaintiff.  If the employer makes such a showing, then the burden shifts back to the plaintiff to show that the employer's proffered reasons are a pretext for unlawful retaliation.

Proceeding under the first step of the <u>McDonnell Douglas</u> framework, and as discussed <u>supra</u>, Plaintiff has established the first element of her <u>prima facie</u> case of FMLA retaliation because a reasonable jury could find that she put Defendant on notice of her intent to take medical leave when she told Kumar about her upcoming surgery.  And it is undisputed that the second element of Plaintiff's FMLA retaliation claim is met here because she was terminated.  Thus, only the third element of her <u>prima facie</u> FMLA retaliation claim regarding causation is at issue here.

          **1.**       **Genuine Disputes of Material Fact Exist Regarding the Causation Prong of Plaintiff's FMLA Retaliation Claim That Preclude Summary Judgment in Defendant's Favor**

Defendant argues that there is no causal connection between Plaintiff's invocation of her FMLA rights and the termination of her employment because she was terminated almost two and a half months after she purportedly provided notice under the FMLA.  Plaintiff, on the other hand, claims that the circumstances surrounding her termination raise an inference of retaliation.  However, viewing the facts in the light most favorable to Plaintiff, there is a genuine dispute of material fact on whether there was a causal connection between her invocation of her FMLA rights and her dismissal.

To establish causation for a claim of retaliation under the FMLA, the Third Circuit has held that a plaintiff:

> must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination.  See <u>Farrell v. Planters Lifesavers</u>

Co., 206 F.3d 271, 279-81 (3d Cir. 2000).  When the "temporal proximity" between the protected activity and adverse action is "unduly suggestive," this "is sufficient standing alone to create an inference of causality and defeat summary judgment." LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007).

Lichtenstein, 691 F.3d at 307.

The Third Circuit has not provided a bright-line rule as to what constitutes unduly suggestive temporal proximity, but it has upheld as unduly suggestive adverse employment actions taken within one week, and has conclusively held that "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." LeBoon, 503 F.3d at 232-33.  And where temporal proximity is not unduly suggestive, courts consider the timing alongside "the proffered evidence, as a whole" and ask whether the evidence "may suffice to raise the inference [of retaliation]." Id. at 232.  The evidence a court may consider for temporal proximity for FMLA retaliation claim includes:  "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." LeBoon, 503 F.3d at 232-33 (citing Farrell, 206 F.3d at 279-81).

While the two-and-a-half months between when Plaintiff invoked her FMLA rights and the termination of her employment on December 3, 2019, or the less than two-month period between when she invoked her FMLA rights and November 15, 2019, the date when Kumar circulated a draft of the Corrective Action terminating Plaintiff's employment to his supervisor, by themselves may be unduly suggestive under the facts of this case and, therefore, show a causal connection, there is undoubtedly evidence upon which a reasonable jury could find that the inconsistencies of Defendant's proffered justifications are sufficient to raise an inference of retaliation.

### a.     Temporal Proximity

The temporal proximity between Plaintiff's invocation of her FMLA rights until her termination also supports an inference of retaliation.  Some time between September 11 and September 25, 2019, Plaintiff informed Kumar of her upcoming hernia surgery which, as discussed supra, creates a genuine dispute of material fact regarding whether Defendant was on notice of her request for FMLA leave.  On September 24, 2019, Selwyn Crittendon, Kumar's direct supervisor, sent an email to Lesley Mancuso stating that Kumar found the "root of his leadership issues," but Kumar testified at his deposition that he did not know what Crittendon was referring to in the email and that he did not speak to any managers regarding leadership issues he believed the store was experiencing in September of 2019.  And at the same time Kumar was drafting his Corrective Action statement against Plaintiff and seeking feedback and edits from his supervisor in mid-November of 2019, Kumar sent Plaintiff the messages referred to above, supra in Section II.H, conveying positive feedback about her work performance.  Thus, based on this evidence, the temporal proximity between Plaintiff's invocation of her FMLA rights and Defendant's termination of her employment on December 3, 2019 is nonetheless relevant to show an intent to retaliate against her when considered with other evidence discussed below.

### b.     "Other Evidence in the Record" Reveals an Inference of Retaliation

There is "other evidence in the record" that is "sufficient to support the inference of retaliatory animus."  LeBoon, 503 F.3d at 232-33 (citing Farrell, 206 F.3d at 279-81).  Genuine disputes of material fact exist regarding whether Plaintiff's 2019 Annual Performance Review and her 2019 Business Navigation Commercial Review were a pretext for retaliation.

First, the parties disagree on who drafted Plaintiff's 2019 Annual Performance Review. Defendant contends, on the one hand, that Frank Briel wrote the comments in the draft and

finalized versions of the performance review.  Plaintiff and Frank Briel, on the other hand, assert that Kumar was the author of the performance review.  In his Declaration submitted in this case, Briel states that he reviewed Plaintiff's 2019 Performance Review and that he was "certain [he] did not write it.  There are several errors in the review, and it refers to someone named Jim multiple times.  I was not aware of any Jim in Lori Thompson's department."  (Doc. No. 26-4 at 3.)  Moreover, Briel "believed that Lori Thompson had made improvement in her performance and in her leadership skills" between fiscal year 2018 and fiscal year 2019.  (Id.)  In addition, Plaintiff's 2019 Performance Review rated each of her seven "Leadership capabilities" and eleven out of thirteen "Assignments" as "Meets Expectations."[17]  (Doc. No. 23-8 at 2-3, 5-6.)  In the 2019 Performance Review, she received only two "Partly Meets Expectations" rating regarding "Assignments."  (Id. at 2-3.)[18]  Briel's Declaration and Plaintiff's 2019 Annual Review conflicts with Defendant's assertions that Plaintiff was terminated because the Commercial Team was underperforming, suffering from poor leadership and low morale, and was not developing in a way that would lead to long-term success.  (See Doc. No. 23-3 at 9.)

Second, several other individuals filed Declarations favorable to Plaintiff in this case pertaining to the 2019 Business Navigation Commercial Review.  Defendant contends that these Declarations are self-serving and that they should be stricken from the summary judgment record.  True, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment."  Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir. 2009)

---

[17] By comparison, in her 2018 Performance Review, Plaintiff received one "Exceeds Expectations," three "Meets Expectations," and three "Partly Meets Expectations" for her "Leadership capabilities."  (Doc. No. 23-7 at 5-6.)

[18] In her 2018 Performance Review, Plaintiff received "Meets Expectations" in ten Assignments, "Party Meets Expectations" in two Assignments, and "Exceeds Expectations" in one Assignment.  (Id. at 2-3.)

(internal quotation marks omitted) (quoting Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002)).  "Instead, the affiant must set forth specific facts that reveal a genuine issue of material fact."  Id. (citing Blair, 283 F.3d at 608).

Here, however, at least one of the Declarations does set forth specific facts relating to whether Kumar manipulated the Business Navigation Commercial Review and whether he relied on that review in filing the Corrective Action against Plaintiff and terminating her employment. Dwight Sweatt, who worked for IKEA as a Lead in Active Selling, stated that during the Commercial Review, Kumar had selected a room for review that "was already scheduled for remodeling and new fixtures" and "permitted Lori Thompson to be blamed for problems such as issues with the fixtures which were not even the responsibility of Lori Thompson's commercial team."  (Doc. No. 26-3 at 3.)  A reasonable jury crediting the averments in Sweatt's declaration could find that Kumar manipulated the 2019 Commercial Review to use as pretext in his Corrective Action when he cited underperformance and poor structure within Plaintiff's department as reasons for her termination.

Additionally, it appears that there are genuine disputes of fact regarding Kumar's observations of Plaintiff's leadership and performance as Commercial Manager.  First, in text messages purportedly between Plaintiff and Kumar that occurred between October 16 and November 25, 2019, Plaintiff discusses with Kumar several actions that she had taken or planned to take in her role as Commercial Manager, such as her availability to schedule walks through the store, her progress with the Commercial Team while Kumar was away from the store for business reasons, and her judgment regarding an employee within the Commercial Team that she was responsible for training.  As noted supra, Kumar sent Plaintiff these messages which conveyed his support both for her role in having her "team working in a better way together" to set up a kitchen

display at the College Park store and for her training of Brandon, to which Kumar told Plaintiff to "[l]et [him] know how [he] can help support [Plaintiff] and Brandon."  (Doc. No. 26-11 at 11-12, 14-17.)

Thus, there is sufficient evidence for a factfinder to find that Plaintiff's termination was causally related to her invocation of her FMLA rights.  Accordingly, Plaintiff has sufficiently alleged a prima facie case of FMLA retaliation.

### 2.     Defendant Provided a Legitimate Nonretaliatory Reason for Terminating Plaintiff

As stated above, under the McDonnell Douglas burden-shifting framework, once a plaintiff has pled a prima facie case, the burden of production shifts to the defendant to articulate some legitimate nonretaliatory reason for the challenged employment action.  See Burton v. Teleflex Inc., 707 F.3d 417 427 (3d Cir. 2013).  Here, Defendant has provided a legitimate nonretaliatory reason for Plaintiff's termination in response to her claims of FMLA retaliation.  Specifically, Defendant asserts that

> Plaintiff was terminated because the commercial team was underperforming, and Kumar saw no progress in the development of the commercial team that would lead to long term success. . . . This resulted in the commercial team having low morale, high stress, and poor ways of working. . . . Moreover, the College Park store was $500,000.00 behind its sales goal and had just received a failing score, 41 percent, on its business navigation review. . . . Finally, Plaintiff's leadership issues were documented in her FY 18 and FY 19 Performance Reviews.

(Doc. No. 23-2 at 20.)  Thus, Defendant has met its burden of production under step two of the burden-shifting framework.

### 3.     Genuine Disputes of Material Fact Exist as to Whether Defendant's Proffered Legitimate Nonretaliatory Reasons for Terminating Plaintiff Were Mere Pretext

Finally, if the defendant meets its burden of production, under the last step of the McDonnell Douglas framework, a plaintiff must show that the legitimate reason offered by the

defendant is mere pretext for discrimination.  Burton, 707 F.3d at 427 (citing Fuentes v. Chrysler

Fin. Corp., 32 F.3d 759, 763 (3d Cir. 1994)).  To survive summary judgment, a plaintiff must

> Prove that the employer's reasons for his termination were pretextual.  [Sh]e may
> do so by "point[ing] to some evidence, direct or circumstantial, from which a
> factfinder could reasonably either (1) disbelieve the employer's articulated
> legitimate reasons . . . or (2) believe that an invidious discriminatory reason was
> more likely than not a motivating or determinative cause of the employer's action."

In re Tribune Media Co., 902 F.3d 384, 402 (3d Cir. 2018) (citing Fuentes, 32 F.3d at 764).

When proceeding under the first method for casting doubt on the employer's asserted

reasons for termination, a plaintiff need not provide evidence that the employer acted with

discriminatory intent, but rather only that a genuine dispute of material fact exists on the credibility

on the defendant's rationale.  See Burton, 707 F.3d at 430.  If the plaintiff's evidence relates to the

credibility of the employer's proffered justification, it "must indicate 'such weakness,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for

nondiscriminatory reasons."  Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644-

45 (3d Cir. 2015) (quoting Fuentes, 32 F.3d at 765).[19]  The Court of Appeals has explained that if

the plaintiff produces sufficient evidence to discredit the employer's proffered justification, she

need not present additional evidence of retaliation beyond that submitted to support her prima facie

case to survive summary judgment.  See Burton, 707 F.3d at 427 (citing Fuentes, 32 F.3d at 764).

Here, Plaintiff has produced evidence that Defendant's proffered legitimate nonretaliatory

reasons for terminating her were pretextual under the above requirement.  As explained supra,

---

[19] As noted supra, courts apply the same analytical framework for analyzing Title VII and FMLA
claims.  For this reason, although Willis refers to "nondiscriminatory reasons," Plaintiff must
point only to some evidence that would allow a reasonable factfinder to find that Defendant's
actions could not have been for nonretaliatory reasons.  See Willis, 808 F.3d at 644-45 (citing
Fuentes, 32 F.3d at 765).

Plaintiff may rely on the evidence used in her prima facie case to show that Defendant's stated reasons are pretext for retaliating against her for exercising her FMLA rights.  For example, three Declarations filed by former IKEA employees, including former Store Manager Briel, demonstrate that there is a genuine dispute of material fact over whether Kumar manipulated the 2019 Business Navigation Commercial Review, which in turn served as one of the factors relied upon in the Corrective Action terminating Plaintiff.  Additionally, the parties disagree over whether Briel or Kumar drafted the substantive comments in Plaintiff's 2019 Annual Review, another item Kumar relied upon in terminating Plaintiff.  Additionally, while Kumar was drafting his Corrective Action against Plaintiff in November 2019 and was away from the store for business reasons, he was sending her messages supporting decisions she made as Commercial Manager.  Finally, as noted above, there is evidence that Kumar also manipulated the 2019 Business Navigation Commercial Review to Plaintiff's detriment.

In sum, Plaintiff has identified evidence that would cause a reasonable factfinder to disbelieve Defendant's proffered reasons for terminating her.  Plaintiff, therefore, has met her burden under the final step of the McDonnell Douglas burden shifting framework.  Consequently, the FMLA retaliation claim alleged in Count I of the Complaint will survive summary judgment.

## V.   CONCLUSION

For the foregoing reasons, Defendant IKEA's Motion for Summary Judgment (Doc. No. 23) will be denied.  An appropriate Order follows.